(98 South. 727)

SOUTHERN RY. CO. v. BIRMINGHAM RAIL & LOCOMOTIVE CO. (6 Div. 984.)

(Supreme Court of Alabama. Jan. 17, 1924.)

**1. Contracts ⚙═16—Meeting of minds essential.**

Where one person offers a thing, and another in words accepts it, and they have in mind different things, there can be no contract, since their minds must meet and concur on every necessary element, including subject-matter.

**2. Contracts ⚙═93(4)—Unilateral mistake as to meaning of unambiguous agreement does not prevent contract.**

If an agreement describes the subject-matter and does not admit of two meanings, the fact that one of the parties by mistake thought it was something else does not prevent a binding contract.

**3. Appeal and error ⚙═931(1)—Court's findings on conflicting evidence presumed correct.**

The findings of the court on conflicting evidence are presumed correct on appeal.

**4. Sales ⚙═69—Facts held to constitute unambiguous binding contract for sale of relay rails as scrap.**

Where plaintiff, in response to a railroad circular listing No. 1 steel rails as scrap material for sale, inspected the material, and a special gang foreman, in the absence of roadmaster, informed him that the roadmaster had agreed to let it all go as scrap iron, both parties knowing that 75 per cent. were relay rails, worth double the value of scrap, and the sales agent confirmed the offer over the telephone, plaintiff's letter offering "$12.50 per gross ton, delivered at," etc., and basing his offer on all materials pointed out at the inspection, confirmed by defendant's letter of acceptance, constituted an unambiguous binding contract to sell relay rails with the scrap as pointed out, notwithstanding defendant's claim that they were included by mistake of its employees.

**5. Corporations ⚙═397—Corporation bound by acts of agencies within scope of employment.**

A sound rule of law requires that a corporation be bound by the acts of each of its different agencies within the scope of its employment, though manifest hardship results, to avoid distrust of third persons dealing with it.

**6. Railroads ⚙═17—Mistake of agent held not to relieve principal from contract of sale.**

A railroad corporation cannot escape liability on a contract made by one of its departments for the sale of certain material merely because of an error in advice given by the inspection department to the sales department in the matter of the classification of such materials for sale.

Appeal from Circuit Court, Jefferson County; C. B. Smith, Judge.

Action by the Birmingham Rail & Locomotive Company against the Southern Railway Company for damages for breach of a contract. From a judgment for plaintiff, defendant appeals. Affirmed.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

Where the seller understands he is selling one thing, and the buyer that he is buying another, there is no contract of sale. 35 Cyc. 50, 61; 9 Cyc. 398; Montgomery v. Enslen, 126 Ala. 654, 28 South. 626; Ind. Fuel Co. v. Ind. Basket Co., 41 Ind. App. 658, 84 N. E. 776.

Miller & Graham, of Birmingham, for appellee.

A mistake of one party only as to the quality of goods does not relieve him from the contract. Products Co. v. Printing Co. (Tex. Civ. App.) 202 S. W. 984; 13 C. J. 376; Boeing v. Fordney, 184 Mich. 153, 150 N. W. 852; Strong v. Lane, 66 Minn. 94, 68 N. W. 765; Musselman v. Bradley, 22 Neb. 784, 36 N. W. 283; Teachout v. Clough, 143 Mo. App. 474, 127 S. W. 672; Thompson v. Ray, 46 Ala. 224; 35 Cyc. 61.

BOULDIN, J. [1] The action is for breach of an executory contract for the sale of chattels. The purchaser sues the seller for failure to deliver.

The defense is no contract by the failure of the minds of the parties to come together on the subject-matter; that the seller was contracting to sell one thing and the purchaser to buy another.

---

⚙═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Mutuality is the essence of all contracts. The minds of the parties must meet and concur on every necessary element of the contract. Among these elements is the subject-matter. In this they must consent to the same thing in the same sense. Where one person offers a thing and another accepts it, and they have in mind different things, there can be no contract. This condition may arise on sale by description, by use of trade-names, or by sale on grade or classification. If it appears that the language used was understood differently by the parties there is no agreement.

An apt illustration is found in the case of Indiana Fuel Supply Co. v. Indianapolis Basket Co., 41 Ind. App. 658, 84 N. E. 776. The thing sold was "Indiana egg coal." There were two grades of such coal, one twice screened, used generally for domestic purposes, and the other screened once, used as steam coal. It sufficiently appeared that the buyer in the negotiations had in mind the doubly screened coal, while the seller had in mind the lower grade. Held there was no agreement, and the seller could not recover for failure to accept coal of the lower grade. 13 C. J. p. 376, § 262.

[2] However, this rule does not refer to a misconception of a party not warranted by the language used or the terms of the agreement. If the agreement describes the subject-matter, and does not admit of two meanings, the fact that one of the parties by mistake thought that it was something else does not prevent a binding contract. 13 C. J. p. 376, § 263; Thompson v. Ray, 46 Ala. 224.

"One is not permitted to accept a promise which he knows the other party understands in a different sense from that in which he understands it. The rule is different if the other party simply knows that the offerer is mistaken as to the value or quality of the subject-matter, or as to his expectation or motives." 13 C. J. p. 374, § 258; 35 Cyc. pp. 61, 62.

[3] These rules have their exceptions, such as the duty to disclose growing out of fiduciary relations, and the like, not material here. These general principles are not debated by counsel in this cause, but the issue is their application to the facts. The cause was tried without a jury on oral testimony of witnesses examined before the trial court. We must indulge the usual presumption as to such testimony as may be in conflict.

[4] The Southern Railway Company, through circular mailed to scrap dealers, invited bids on "the following items of scrap material, Storekeeper's Association classification." One item listed was: "No. 42 2,000,-000 lbs. No. 1 steel rail." The classification of this item was:

"42 No. 1 steel rail, 5 feet long and over, 50 lbs. and over, standard section, free from frog, switch, guard, bent, curved, and circle rails."

This circular inviting bids was received by Birmingham Rail & Locomotive Company. Inquiry was made by this company as to location of the material offered, with request for opportunity to inspect it. The location of some 1,870,000 pounds was given on Knoxville division, an opportunity given for inspection, and the inquirer referred to the roadmaster at Knoxville to point out the rail offered.

Mr. Hawkins, of plaintiff firm, went to Knoxville and in the absence of the roadmaster was referred by the chief clerk to Mr. Manes, a special gang foreman. A part of his duty was to load and unload scrap rail coming into the yard. This duty called for inspection in filling shipping orders for scrap rail. Manes went with Hawkins upon the assembling yard, and showed him the piles of rail, aggregating some 1,100,000 lbs. Both Hawkins and Manes knew these piles were unassorted rails taken up in relaying tracks with new and heavier rails—that some 75 per cent. or more were known as "relay rail," worth in market about twice the price of No. 1 scrap rail. There is conflict between these two witnesses as to the interview at the time—about the only substantial conflict in the testimony. Mr. Hawkins says they discussed the probable proportion suited for relaying purposes and Manes advised him that he and the roadmaster had conferred and agreed to let it all go as scrap rail, that in loading out only the pieces running below No. 1 scrap would be assorted out and all the others shipped as scrap.

It is without dispute that the entire lot had been reported to Mr. Telford, the sales agent at Washington, as scrap rail. Relay rail was sold through another agent. On Mr. Hawkins' return to Birmingham, Mr. Williams, of plaintiff firm, called Mr. Telford by long distance telephone, inquired if bidding was still open, informed Mr. Telford an inspection had been made of scrap rail shown them on the yard at Knoxville, that it was satisfactory, and made an offer of $12.50 per ton. Mr. Telford advised him that a written order would have to be sent in, and that he would accept such bid.

Mr. Williams says that in this interview Mr. Telford asked if he intended to use the material as relay rail, and he advised Mr. Telford that he was paying above scrap prices, and would apply it to any use he could. Mr. Telford does not admit this last statement. It further appears plaintiff's bid was 25 per cent. above other bids made on the basis of the circular, and 15 per cent. to 25 per cent. above the ruling price for No. 1 scrap rail. It further appears plaintiff was buying with a view to fill an order for relay rail to construct a logging road.

Thus far the matter rested in negotiation only. Following the telephone conversation, the plaintiff firm wrote the following letter:

"Mr. A. Telford, Ass't Gen'l Pur. Agt. Southern Railway, Washington, D. C.—Dear Sir: We hereby confirm telephone conversation had with you this morning, with reference to the material which was inspected by our Mr. Hawkins at Knoxville yesterday. This material was shown Mr. Hawkins by your representative, Mr. Manes, and we refer to the material which Mr. Manes pointed out as No. 1 scrap rail.

"For this material we offer you $12.50 per gross ton delivered on cars at Birmingham or North Birmingham, or at Knoxville, Chattanooga, Memphis, Atlanta or intermediate points if we should elect. As explained on the 'phone, however, we will, in all probability, bring this material to North Birmingham and stack it on our yard, as there is very little demand at the present. This offer is based upon taking all of the material which was pointed out to Mr. Hawkins by Mr. Manes as the No. 1 scrap rail, and which we understand covers the approximate tonnage named in your letter to us of July 19th.

"If you will let us have your formal acceptance of this order we will give you prompt shipping instructions.

"Yours truly,
        "Birmingham Rail & Locomotive Co.,
"RJW/KM          By R. J. Williams.
"P. S.—Terms as outlined in your request for bids."

To this defendant replied:

"I am in receipt of your letter of the 22nd instant and beg to confirm the sale to you of the one million eight hundred fifty thousand pounds (1,850,000) No. 1 scrap steel rail reported by our Knoxville division, at $12.50 GT, F. O. B. our tracks.

"If you will kindly forward me shipping instructions for this rail together with your check for its approximate value, sale order will be issued immediately and the rail promptly shipped to you.

"Yours very truly,          A. Telford,
        "Assistant General Purchasing Agent."

The check and shipping instructions were promptly sent. Shipping orders were sent to Knoxville. Plaintiff demanded shipment of the rails inspected, defendant claimed the contract did not cover the relay rails on the yard, and refused to ship. Hence the suit.

The letters above constitute the contract of sale—a contract in writing. We think the contract clear and unambiguous; that no question of identity of the subject-matter arises thereunder. The sale was of a specific object, not a sale on classification as contemplated in the circular. The contract shows the thing sold was the rail pointed out and theretofore reported as scrap rail. It cannot be modified or varied by parol evidence. The only matter resting in parol is what rail had been reported to Mr. Telford as scrap rail and pointed out to Mr. Hawkins as scrap rail. The contract expressly declares that all this should go. Both parties are concluded by the contract itself as to the subject-matter intended. A clear distinction must be drawn between this and cases of mutual mistake, which may be rescinded in equity, as well as cases of concealment or misrepresentation, avoidable for fraud.

[5, 6] The case presents the simple question whether defendant is relieved by the mistake of its agents as to the quality, grade, or classification of the object sold. In this regard it must stand on the same footing with an individual selling his own property.

In the conduct of great enterprises, it must needs be that different agencies be employed. The act of each within its scope is the act of the company. In this case one duty was on an inspection department, another on the selling division. In some way one misled the other. It is apparent Mr. Telford did not know the amount of relay rail, on a proper classification, was on the Knoxville yard. Yet, acting on the reports made to him, he did sell the rail as scrap.

While a manifest hardship results to defendant in the particular case, a sound rule of law in the premises is essential to its own operations. If the company is not bound to third persons because of an error in advice given by one division to another in the matter of classification of its materials for sale, then outside parties dealing with the company would have to assume the risk of such errors intervening to avoid contracts. This would breed distrust, tend to limit the activities of each department to matters personally known to its officers, would become a demoralizing influence within, and a bar to the growth of modern business organization.

We agree with the lower court that there was a binding contract.

Affirmed.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.