**McDONOUGH CONSTRUCTION COMPANY, a Corporation, Libelant-Cross-Respondent,**

**v.**

**J. W. TUTT, Respondent-Cross-Libelant.**

**No. 2727.**

United States District Court
S. D. Alabama, S. D.
Sept. 28, 1962.

Armbrecht, Jackson, McConnell & De-Mouy, Mobile, Ala., for libelant.

William H. Cowan, Holberg, Tully, Hodnette & Mobley, Mobile, Ala., for respondent.

DANIEL HOLCOMBE THOMAS, District Judge.

McDonough Construction Company, a corporation domiciled at Parkersburg, West Virginia, brought this libel against J. W. Tutt, the respondent, who maintains a place of business at Nanafalia, Alabama. Libelant claims $20,000 damages for breach of an alleged bare boat verbal charter party agreement, entered into on or about March 27, 1958, with respondent.

The pertinent terms of the agreement, as claimed by libelant, are that respondent hired four barges, each being free of latent defects and seaworthy in every respect, for use on the Warrior-Tombigbee Rivers and adjacent waterways, under charter commencing when the barges were picked up at Parkersburg, West Virginia, and continuing for a period of not less than three months and there-after until the barges were returned to owner's landing at Parkersburg. The hire was to be $28 per barge, per day, during period of charter, the charterer having the option at the completion of three months to purchase the barges, with $10,000 of the first three months' rental to apply on the purchase price. Charterer was to pay all transportation charges. Representatives of owner and charterer were to make a joint inspection of the barges at the beginning and end of the charter period, and furnish written report of such inspections to both parties. Charterer was to place and maintain standard fire and marine insurance in the amount of $30,000 per barge, with deductible not to exceed $500.

Libelant avers: that, under express authority from respondent, it insured the barges for respondent and procured for respondent the services of Lea River Lines, Inc., which, acting as respondent's agent, towed the barges from Parkersburg, West Virginia, to Municipal Landing at New Orleans, Louisiana, known as Point Landing; that respondent, having taken possession of the barges, attempted to repudiate the barge charter agreement and abandoned the barges, although libelant had fully performed its part of the agreement; that libelant mitigated its loss by selling two barges and rechartering the other two.

Respondent answered, admitting only the jurisdiction of the court and denying all other allegations of the libel. In his cross-libel, he alleges: that it was agreed if on inspection at New Orleans the barges were found to be of good quality and condition, seaworthy in every respect, free of latent defects, suitable for use by cross-libelant in the usual course of his business, a contract would be made between parties, confirming substantially the same terms as set out in the libel, with option at the expiration of three months of charter period to purchase the barges for $30,000 each, and have $10,000 of the rental credited on the purchase price; that the barges furnished by libelant were not of good quality and condition, were not seaworthy nor suitable for

use by cross-libelant in the usual course of his business contemplated and were not insurable in the amount agreed. Cross-libelant claimed $118,000 damages of libelant for additional expense in obtaining other barges, costs incurred maintaining a boat and crew, and loss of profits due to delay in locating other barges.

The testimony discloses that when the respondent and cross-libelant, J. W. Tutt, decided to engage in water transportation of iron ore and coal over the Warrior-Tombigbee River system, with the use of a tugboat and barges, he undertook to locate the necessary equipment for this venture. In his search, he noticed an advertisement, inserted in a publication known as "The Waterways Journal," offering barges for charter or sale by Kanawha Sand Company of Parkersburg, West Virginia, a company associated with libelant. Tutt, who was inexperienced in this type of business and unfamiliar with the kind of barges most suitable, engaged the services of Captain Hillman Logan, who was operating a similar business on the Mississippi River, to accompany him to Parkersburg to inspect the barges he hoped to find.

They arrived at Parkersburg on or about February 24, 1958, where Tutt met one J. T. Wakley, sales representative of libelant, and informed him that he, Tutt, wanted to charter barges with option to purchase, for use in the towing business he had planned. Tutt and Logan with Wakley, aboard libelant's tugboat, were carried to a place on the Ohio River where libelant kept a number of barges moored. Wakley left the tug to check with a crew of men engaged in raising a sunken barge. Logan boarded one of the barges, offered by libelant for charter, to make an inspection, but found considerable ice on the deck and in the hull of barge. This condition caused his work to be unsatisfactory and a dangerous undertaking. He returned and informed Tutt that adverse conditions would not allow for proper inspection. Tutt did not leave the tug. Shortly thereafter Wakley boarded the tug and the parties returned to the office of Kanawha Sand Company. There Tutt conferred with Wakley, informing him that inspection could not be made due to ice and water in the barges.

In the course of conversation, Tutt advised Wakley that he was interested in a charter with option to purchase arrangement, and that his contract would involve high speed towing and a barge suitable for this service must be good and equipped with long rakes. Wakley said his company had several barges and that he would pick out four good ones suitable to the use Tutt contemplated, which he would charter at $28 per day each, with option given Tutt to purchase the barges at the completion of three months of charter contract period for $30,000 each, with $10,000 of first three months' rental to be credited to sale price of barges. The insurance coverage was to be in the sum of $30,000 with $500 deductible on each barge; and he would send them to New Orleans, Louisiana, for docking and inspection. Tutt agreed to accept the barges if they met inspection. Thereupon Logan and Tutt left Parkersburg.

Subsequently, Tutt, having acquired a tugboat which was docked at New Orleans, and having entered into a towing contract, notified Wakley by telephone that he, Tutt, would charter the barges on the terms stated if they were suitable and met inspection, and requested the barges be shipped to New Orleans, where a joint inspection would be made. If the barges passed inspection, a charter contract would then be executed. Tutt later confirmed this arrangement by telegram to Wakley.

Wakley sent four barges, numbers McD 101, 112, 108 and 110, by Lea River Lines, Inc., and agreed to meet Tutt in New Orleans when the barges arrived. The four barges reached New Orleans on or about April 15, 1958, where Tutt was waiting to meet with Wakley. However, the latter was called out of the States on account of other business, and did not keep his appointment.

Another of libelant's representatives, stationed at New Orleans, informed Tutt

by telephone that the barges had arrived but Wakley could not keep his engagement to meet with him. Tutt, having secured insurance on his tugboat, requested his insurance carrier to inspect the barges to determine if they were seaworthy and insurable. Harry E. Miller, an inspector for Marine Office of America, an insurance agency placing insurance on Tutt's tugboat, made an inspection of one or more of the barges and advised Tutt that in his opinion the barges were not seaworthy and his company would not insure them. Tutt employed an independent marine surveyor, who advised him the barges were in poor condition and not suitable for coal and iron ore trade in the use contemplated. Tutt notified libelant's New Orleans representative that he would not accept the barges for charter. Libelant then docked the barges and expended approximately $500 on each barge, installing patches and making some other repairs. On April 28, 1958, libelant sold two of the barges, McD 108 and McD 110, for $32,000 each to Delehite Boat Service of Galveston, Texas, and on June 9, 1958, chartered barges McD 101 and McD 112 to Mid-America Transportation Company.

The towing charge from Parkersburg, West Virginia, to New Orleans, via Lea River Lines, Inc., was $3,514, and the trip insurance premium on the empty barges in transit amounted to $500, which libelant has paid.

■■ The court, having heard and considered all of the evidence, is of the opinion and holds that no charter agreement was ever made between the libelant and the respondent as claimed by libelant. The court is also of the opinion and holds that libelant never made an agreement to furnish barges of the quality and type as claimed by respondent in his cross-libel.

Weather conditions prevented adequate inspection at Parkersburg. There was no meeting of the minds between J. T. Wakley, libelant's representative, and J. W. Tutt, respondent, as to the quality and condition of the barge each was considering in their negotiations.

■ There are numerous authorities defining the elements of contract and the essential parts necessary to creating binding obligations:

"* * * the statement that a contract is 'an agreement which creates an obligation' would seem to embody all of its essential elements, which may be enumerated as: (1) Parties competent to contract. (2) A subject matter. (3) A legal consideration. (4) Mutuality of agreement. And (5) Mutuality of obligation." 13 C.J. Contracts § 1, pp. 237, 238.

"There can be no contract in the true sense, that is, as distinguished from quasi or constructive contracts, in the absence of the element of agreement, or of mutual assent of the parties." 17 C.J.S. Contracts § 30, p. 358.

In Chas. R. Shepherd, Inc. v. Clement Brothers Company, Inc., 177 F.Supp. 288, at p. 291 (D.C.W.D.N.C.), the district judge quoted with approval Prince v. McRae, 84 N.C. 674, as follows:

"A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree."

See also National Bank of Kentucky et al. v. Louisville Trust Co., 6 Cir., 67 F.2d 97, at p. 102:

"If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement even though the negotiations evidenced a complete willingness, or even an announced determination, to agree in the future upon such issues as might subsequently arise, it must still follow that a valid and binding contract was not made as of the earlier date."

And, quoting from Justice Sayre in C. W. Cochran Lumber Co. v. Paterson & Edey Lumber Co., 202 Ala. 366, 80 So. 448, at p. 449:

"It is elementary law that there must be a concurrence of intention to constitute a contract—the minds of the parties must meet and concur as to all the essential elements the contract involves, as to the subject-matter, and as to their respective rights and duties."

Again, in Southern Ry. Co. v. Birmingham Rail & Locomotive Co., 210 Ala. 540, 98 So. 727, at p. 728, Justice Bouldin said:

"Mutuality is the essence of all contracts. The minds of the parties must meet and concur on every necessary element of the contract. Among these elements is the subject-matter. In this they must consent to the same thing in the same sense. Where one person offers a thing and another accepts it, and they have in mind different things, there can be no contract. This condition may arise on sale by description, by use of trade-names, or by sale on grade or classification. If it appears that the language used was understood differently by the parties there is no agreement."

Respondent Tutt requested that the barges be delivered to New Orleans for a joint inspection to determine whether they were of good quality, seaworthy, and the kind that he contemplated chartering. Wakley apparently considered the barges were of the type and kind that respondent wanted, and agreed to the arrangement to have four of them transported from Parkersburg on the Ohio River to New Orleans, and agreed to meet Tutt at New Orleans for a joint inspection.

Libelant arranged with Lea River Lines to tow the barges from Parkersburg to New Orleans at a cost of $3,514, and purchased insurance at a premium of $500 on the empty barges covering the trip.

Wakley did not meet with Tutt to make the inspection but had a representative of libelant who was stationed in New Orleans contact respondent and inform him that the barges had arrived. Tutt had two inspectors examine the barges and concluded they were not of the kind and quality that he understood libelant would furnish. Within two or three days after the barges arrived he notified libelant's New Orleans representative that the barges were not acceptable and that he would not charter them. Within less than fifteen days after the barges had arrived, libelant had sold two of the barges for $32,000 each to Delhite Boat Service of Galveston, Texas. Both libelant and respondent agreed that the insured value of each barge was $30,000 and that respondent could have purchased the barges for $30,000 each.

Tutt had a towing contract with the Alabama Power Company and not only did he contemplate chartering the barges but expected to purchase them at the agreed price. Libelant paid all of the towing expenses and the trip insurance premium; however, libelant sold two barges for $4,000 more than the agreed price which it had made with respondent. This difference more than covered the towing charge from Parkersburg to New Orleans. The fact that the barges were brought to New Orleans unquestionably contributed to libelant's advantage in making the sale with Delhite Boat Service, as this was the ultimate destination of the two barges which were sold to Delhite. Libelant benefitted from this sale and justly should bear the towing expense of moving the barges from Parkersburg to New Orleans.

The barges were not the kind Tutt expected, and he did not derive any benefit on account of the fact that they were brought to New Orleans for inspection, although he made an agreement with Wakley that the barges would be moved for the purpose of inspection, and respondent should be required to reimburse libelant for the amount of the insurance premium in the sum of $500.