371 So.2d 35 (1977)
VESTER J. THOMPSON, JR., INC., a corporation.
v.
CITMOCO SERVICES, INC., a corporation.
Civ. 989.
Court of Civil Appeals of Alabama.
May 4, 1977.
Rehearing Denied June 8, 1977.
*36 J. Edward Thornton, Mobile, for appellant.
W. Dewitt Reams and James D. Brooks, Mobile, for appellee.
BRADLEY, Judge.
Plaintiff, Vester J. Thompson, Jr., Inc., a corporation, filed a complaint in the Circuit Court of Mobile County alleging that defendant, Citmoco Services, Inc., a corporation, owed it $8,937.90 for work and labor done in carrying out an agreement to furnish certain engineering services. Defendant filed a general denial, and trial was had before the court sitting without a jury. A judgment was rendered in favor of plaintiff for $4,849.11. Plaintiff appeals, claiming the judgment is inadequate.
The evidence shows that Bart B. Chamberlain, Jr., president of Citmoco Services, Inc., contacted Vester J. Thompson, Jr., president of plaintiff corporation, by telephone on Friday before Labor Day 1973 and asked him to recommend a foundation for a bulk oil storage tank to be built on property owned by Citmoco adjacent to the Mobile River just north of the Cochrane Bridge on U.S. Highway 90 in Mobile County. Thompson told Chamberlain that he would take some soil samples and perhaps make *37 some other tests over the holiday weekend and be prepared to make a recommendation to Chamberlain on Tuesday after Labor Day. This was satisfactory to Chamberlain and four test borings were done over the weekend.
At their meeting on Tuesday Thompson suggested to Chamberlain that the foundation for the tank be prepared by a method never before used in the Mobile area and one fairly new to the industry whereby sand is densified. The densification process, called a terraprobe, was said to be cheaper than building a concrete cap on top of piles. Chamberlain agreed to the use of this new process for the preparation of the foundation for the storage tank and asked Thompson to design the foundation, provide all services necessary to installation of the foundation, and supervise the installation. They then discussed the cost of Thompson's services.
Thompson testified he told Chamberlain that it was his company's practice to bill any job which could not be clearly defined on a unit fee basis, i.e. a fixed, standard fee per unit of work done or per hour worked by classified personnel. He said he was unable at that point to give Chamberlain a definite cost amount. However, Chamberlain attempted to establish a figure by asking whether Thompson's work would cost $2,000 or $3,000, $5,000, or $10,000. Thompson said that to the $10,000 figure he replied, "Well, you are getting in the order [of] what it's going to be." Thompson testified that he did not agree to do the job for $10,000, or even intimate that $10,000 would be the fixed price of the project or that there would be a fixed price contract.
Chamberlain testified that Thompson told him Thompson did not know how much the engineering involved would cost. However, Chamberlain said he needed some sort of figure because he had to keep a tight control on his costs, as he was operating under contract to someone else. After he asked Thompson whether it would cost $2,000 or $3,000, etc., Thompson told him the final sum would be closer to $10,000 than to $5,000. In reliance on the $10,000 figure, Chamberlain told Thompson to go ahead with the project, using the terraprobe process.
Thompson selected a site for the tank, then engaged Gulf City Construction Company to do the terraprobe. Gulf City submitted a proposal to furnish all labor, equipment and materials necessary to perform the terraprobe for the tank foundation for five days for $11,130; thereafter the daily rate would be $1,540. Chamberlain accepted this proposal. Alabama Asphalt Paving Company was then engaged to perform the necessary excavation and earthen dike construction. Its proposal, accepted by Citmoco, was estimated for $88,085.60; it expressly did not guarantee the quantities upon which the estimate was based. All facets of the work done by both Alabama Asphalt and Gulf City cost more than originally estimated.
By the time the work Thompson undertook was completed, Citmoco had paid Thompson $6,482.89, based on the fee schedule originally submitted to Chamberlain. After the completion of the job, Thompson submitted a final bill for the remainder of the work to Citmoco in the amount of $8,937.90, again in accord with the fee schedule originally submitted to Chamberlain. Chamberlain refused to pay the additional amount claimed owed because he contended it exceeded the $10,000 limit to which they had agreed at the beginning of the job.
After some attempt to negotiate a settlement, Thompson brought this suit against Citmoco for work and labor done for the full amount of services performed, $8,937.90.
Appellant Thompson argues in brief as its first issue that Citmoco is precluded from raising as a defense the cost limit of $10,000 allegedly orally contracted by the parties, since this defense was not specially pled at trial. It is true that Citmoco filed only a general denial to Thompson's action for work and labor done, yet on appeal says that it does not owe Thompson any amount in excess of $10,000, the contract limit *38 agreed to at the beginning of the negotiations. Thompson says that this defense amounts to a plea of recoupment and must be specially pled as required by Mayberry v. Leech, Harrison & Foxwood, 58 Ala. 339 (1877), and Title 7, Section 357, Code of Alabama 1940 (Recomp. 1958).
We agree with appellant's argument that the Alabama Rules of Civil Procedure did not specifically repeal, supersede or modify section 357, supra; however, Rule 8(c) provides for the special pleading of affirmative defenses and therefore in effect supersedes section 357. We conclude that recoupment, being an affirmative defense should have been specially pled.
However, our conclusion does not require a reversal of the trial court's judgment because the answer filed by Citmoco is deemed amended under Rule 15(b), ARCP, which provides in part as follows:
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."
The Committee Comment adds:
"... Under the rule where evidence is introduced or an issue raised with the express consent of the other party, or without objection from him, the pleadings `shall' be deemed amended to conform to such evidence."
It is evident that the supreme court intended Rule 15(b) to apply to amend a pleading which fails to specially plead a matter as required under the Alabama Rules of Civil Procedure. In Associates Financial Services Co. v. First National Bank, 292 Ala. 237, 292 So.2d 112 (1974), the problem before the court was whether the plaintiff, who had alleged fraud in its complaint, was required to plead in replication to the defendant's answer alleging the statute of limitations. Although the then new Rules of Alabama Procedure did not apply in that case, the court said that a complaint under the ARCP should contain a statement showing time and circumstances of the discovery of the alleged fraud in light of the requirements of Rule 9(b). It then added:
"... This observation is not to be construed as in any manner obviating the operative effect of Rule 15(b) relating to amending the pleadings to conform to the evidence." 292 Ala. at 242, 292 So.2d at 115.
In the case at bar Thompson did not object either to testimony regarding the oral agreement nor to the introduction of letters for the purpose of showing what Citmoco thought the agreement between the parties to be. Thompson gave his own rebuttal testimony as to the agreement and offered his own letters. Thus, the issue was clearly tried with consent and the trial court committed no error.
We now come to the central issue in this case, whether the parties entered into a fixed price contract for the work to be done by Thompson. Thompson makes two separate arguments in brief: (1) that there was no oral agreement for a fixed price contract, and (2) even had there been an oral agreement it was subsequently merged into a written agreement that had no fixed price maximum. However there is no written contract in this case. The writings upon which Thompson relies are the invoices and acknowledgements of orders submitted by Thompson to Citmoco, and the correspondence between the parties. These writings do not constitute a contract but simply reflect the position of the parties as to their oral agreement. Thus, the sole issue is whether the parties orally agreed on a maximum price for Thompson's services.
Citmoco's position is that the evidence was in dispute as to whether the parties agreed to a maximum contract price. The trial court's judgment resolved the dispute in its favor and this judgment should be affirmed.
A careful review of the evidence pertinent to this issue compels the conclusion there was no meeting of the minds as to a maximum price beyond which Citmoco would not be required to pay. In order for there to be a binding contract, a meeting of the minds of the contracting parties must *39 take place. Board of Commissioners of Alabama State Bar v. Jones, 291 Ala. 371, 281 So.2d 267 (1973); Christian v. Rabren, 290 Ala. 45, 273 So.2d 459 (1973). In Southern Ry. Co. v. Birmingham Rail & Locomotive Co., 210 Ala. 540, 541, 98 So. 727, 728 (1924), it was said:
"... The minds of the parties must meet and concur on every necessary element of the contract. ... In this they must consent to the same thing in the same sense. Where one person offers a thing and another accepts it, and they have in mind different things, there can be no contract."
In the case at bar, regardless of what Chamberlain thought, it is clear that Thompson never intended to quote a maximum guaranteed price for the work he was to do, but gave Chamberlain an estimate only.
Furthermore, in construing the evidence most favorably to Chamberlain we fail to find that it supports his contention that Thompson bound himself to a guaranteed maximum price for the work to be done. Although there is conflict in the testimony as to what was said in the initial conversation regarding the cost of the project, both Thompson and Chamberlain agreed that Thompson said the final charge for Thompson's engineering services would be somewhere around $10,000, or closer to $5,000 or $6,000 than to $10,000. This language can in no way be construed as a fixed price for the reason that it is impossible to ascertain what precise cost figure was intended. If Thompson's testimony is believed then the price was to be in the neighborhood of $10,000. Thus, the cost could have been more than $10,000 as easily as it could have been less than $10,000, and still have been approximately $10,000. It is impossible to ascertain how much more or how much less was acceptable to both parties at the time of the conversation. On the other hand, if Chamberlain's testimony is believed the fact remains that it is impossible to ascertain what exact price the parties intended, as the range between $5,000 and $10,000 is rather broad and it is impossible to know how much closer to $5,000 than to $10,000 the parties intended. It thus appears from this testimony that at the time of the conversation, the point at which the oral contract was formed, both parties understood the $10,000 figure given by Thompson to be only an estimate, not the maximum price Thompson would charge for his work.
This conclusion is supported by the correspondence between Thompson and Chamberlain. In a letter from Thompson to Chamberlain dated January 24, 1974, in which Thompson submitted his final bill, Thompson said:
"In evaluating the amount of our invoice, bear in mind that this includes Preliminary Planning, Engineering, soil borings and testing, and field supervision. Where a separate engineering firm is involved the soil borings and testing are an additional item, and most engineering contracts include field supervision as special services and an extra item.
"Before I even knew of the details of the scope of the project, I was somewhat pressed into an estimate of the cost of our services, which was given as up to the order of $10,000." (Emphasis added.)
Chamberlain responded in a letter dated January 28, 1974, stating:
"Then, having described the undertaking, I asked you how long it would take to do the earth and foundation work, whether you would be free to engineer and supervise it, and what the cost for your engineering and supervision would be. You first responded that you did not know. Then I asked you to tell me what the order of magnitude of your charges might be for such services and illustrated my question by asking whether they would be $2500, $5000, $7500 or $10,000, and you assured me that they would be less than $10,000, and closer to $5000 than to $10,000.
"I have never received from you any other or different information, nor have you on any of the numerous occasions when we have discussed this matter suggested that your charges would be anything like $15,000, and I am quite disturbed *40 to find that your charges, like those of one of the contractors you engaged, are almost precisely 100 percent above estimate.

"The thing that concerns me most about all this is your apparent feeling that, having given an estimate, whether as to your own work or that of a contractor, you have no obligation when costs are vastly exceeding estimates, and when that fact is known only to you, to inform your customer before substantial excess costs are incurred." (Emphasis added.)
Again on March 12, 1974 Chamberlain wrote to Thompson as follows:
"Dear Vester:
"Please give us an analysis of the expenses incurred or paid by your firm for outside engineering work such as but not limited to those of Rowe Engineering, which were not discussed or contemplated when you assured us that the cost of engineering and related services by your firm on the terminal project would `be closer to $7500 than $10,000.'"
Then on January 14, 1975 Chamberlain wrote Thompson:
"Dear Vester:
"The purpose of this letter is to conclude correspondence about your charges for the engineering work you performed for this company in connection with the preparation of the foundation for the 125,000-barrel tank which was recently constructed north of the causeway.
"I hope this letter will achieve its purpose.
"On March 12, 1974 I wrote you and quoted a conversation I had had with you. You have not denied and, incidentally, you are in no position to deny the correctness of my quote to the effect that `the cost of engineering and related services by your firm on the terminal project would be closer to $7500 than $10,000.'
"I did not ask you for an estimate. I asked you for a price and you replied by giving a price within stated limits.
"Your total billings for the services concerning which you gave us the price exceed the top limit by $5420.79."
In Thompson's letter to Chamberlain he said he gave an estimate, not a fixed price, and Chamberlain responded in kind by referring to the $10,000 figure as an estimate. Not until January 14, 1975, over a year after the conversation, did Chamberlain characterize the $10,000 figure as a fixed contract price. But it is the intent of the parties at the time of making the contract which controls, not what a party perceives over a year later to have been the intent. United States v. Seventy-Seven Acres of Land, 88 F.Supp. 349 (S.D.Ala. 1950); cf. G. F. A. Peanut Association v. W. F. Covington Planter Co., 238 Ala. 562, 192 So. 502 (1939). It therefore appears from the correspondence of the parties, as well as from their testimony, that at the time the oral contract was made both parties understood the $10,000 figure to be an estimate, not a fixed price.
We have failed to find an Alabama case defining "estimate;" however, several cases from other jurisdictions have construed this word. In Denniston and Partridge Co. v. Mingus, 179 N.W.2d 748 (Iowa 1970), the Iowa Supreme Court said:
"The `estimated cost' of a building means the reasonable cost of a building erected in accordance with plans and specifications referred to and not necessarily the amount agreed upon by the parties or an offer accepted by defendant. An estimate is equivalent of `more or less' and does not pretend to be based on absolute calculations. Use of the word precludes accuracy. `To make an estimate' ordinarily means to calculate roughly or to form an opinion as to amount from imperfect data." 179 N.W.2d at 752. (Citation omitted).
The Missouri Supreme Court said in J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261 (Mo.1973), that:
"The term `estimate' has been considered in decisions in this state. For example, in Gratz v. City of Kirkwood, 165 Mo.App. 196, 145 S.W. 870, 874 (1912), the court said: ` * * * An estimate does not pretend to be based on absolute *41 calculations but is exactly what the word means, an estimate. To make an estimate, ordinarily means "to calculate roughly, or to form an opinion as to amount from imperfect data." Louisville, H. & St. L. Ry. Co. v. Chandler's Adm'r (Ky. Court of Appeals) 72 S.W. 805. Webster's New International Dictionary (Ed. 1910) defines the word "estimate" as meaning "to fix the worth, value, size, extent, etc., of, especially roughly or in a general way." The use of the word estimate "precludes accuracy. * * Monthly estimates are understood to be mere approximations." Shipman v. State, 43 Wis. 381, loc. cit. 389, citing 1 Redfield on Railways, 436.'
"In Beeler v. Miller, 254 S.W.2d 986, 990 (Mo.App.1953), the court quotes with approval from Gratz v. City of Kirkwood, supra, and recognizes that an estimate is an approximation. In Klein v. Puritan Fashions, Inc., 439 S.W.2d 229, 232 (Mo. App.1969), the court had this to say: `First, the words "estimate" and "estimated" are inconsistent with a promise to do specific work for an exact sum. The word "estimate" negates certainty; it means "to calculate roughly, or to form an opinion as to amount from imperfect data." (Beeler v. Miller, Mo.App., 254 S.W.2d 986 [4-6].)'" 491 S.W.2d at 266.
To this court the evidence is overwhelming that both parties were talking about estimates, or approximations of costs, and by the use of these indefinite terms eliminated the conclusion that they had intended to agree on a definite, accurate, stated amount beyond which Chamberlain would not be obligated to pay.
Citmoco seeks to fall within the scope of R. L. Bains Builders, Inc. v. Bice, 275 Ala. 23, 151 So.2d 747 (1963), a case similar to the one at bar. There a contractor brought suit to enforce a mechanic's and materialman's lien against the owners of a house because he had not been paid for his repair and remodeling work. The contractor contended he had done the work on a cost-plus basis; the homeowners maintained the contract for labor and work was done at an estimated cost. The final bill exceeded the estimated cost by $518. The homeowners testified that the contractor had agreed that in no event was the material and labor to exceed $12,500, and that they had told the contractor on several occasions that they were financially unable to pay any excess; the contractor disputed the homeowners' story. The supreme court upheld the trial court's finding that the homeowners had been induced to sign the contract upon the representation that the cost of labor and the material in repairing and remodeling the house would not exceed $12,500.
In the case at bar the record is completely void of any evidence that Thompson gave Chamberlain the kind of assurance as to price as was involved in the Bice decision. Thus, that case is not controlling here.
Consequently we hold that the trial court erred in finding that the parties had agreed to a maximum amount of $10,000 for Thompson's services. The judgment of the trial court is reversed and the cause remanded for further proceedings to determine the value of the work and labor Thompson performed for Citmoco.
REVERSED AND REMANDED.
WRIGHT, P. J., concurs.
HOLMES, J., dissents.
HOLMES, Judge (dissenting).
Each member of this court has carefully considered the various controlling principles of law. Positions on the correct disposition of the appeal have changed and rechanged. However, with all due respect and after careful study and reflection, I must respectfully dissent.
Suffice it to say that in my view, sufficient, though slight, evidence was presented by the appellee to present a conflict in the testimony as to whether a contract was created. If this conflict, as I view it, was created, then it became the duty of the trial court to resolve that conflict. Ingram v. Brookbank, 45 Ala.App. 388, 231 So.2d 164 (1970).
*42 I should not be understood as saying that I would have found as the trial judge did, but it is not our duty to substitute our judgment for the trier of facts, even though we may have reached a different conclusion. McPherson v. Everett, 277 Ala. 519, 172 So.2d 784 (1965). I therefore dissent.