C.H. Quick appeals from a judgment ordering him to pay $64,200 to Gordon Campbell under the provisions of a contract to repurchase stock from Campbell upon termination of Campbell's employment at New Decatur Radio, Inc., d/b/a WMSL. Quick contends that the trial court's enforcement of the contract leads to an unconscionable result and a disregard of the parties' intent and, further, that the trial court erred in its valuation of the stock. We affirm.
In December 1978 C.H. Quick owned 100% of the stock of New Decatur Radio, Inc., which operated radio station WMSL. Quick, individually and as president of New Decatur Radio, entered into an employment agreement with Gordon Campbell on 26 December 1978, by which Campbell was to become general manager of the radio station beginning in January 1979. Quick had been managing the station himself but felt that with a full-time manager the station might become more profitable. He had known Campbell for three years, although the two had never worked together. Campbell was general sales manager for radio stations WDRM and WHOS in Decatur at the time he agreed to go to work for New Decatur Radio.
As a result of the agreement, consummated on 18 May 1979, a share of stock in New Decatur Radio was issued to Campbell in consideration of the payment of $18,000 in cash plus a promissory note for $7,000, payable 18 May 1980. On 17 March 1980, a dispute between Quick and Campbell resulted in Quick's asking for Campbell's resignation, which was given. On 16 May 1980, Campbell offered to pay the balance due on the note plus accrued interest; Quick refused that offer. Thereupon, Campbell filed this action seeking a determination of the fair market value of his stock and specific performance of the employment agreement that in parts pertinent to this case reads: *Page 266 
 "8. As an inducement to Employee to enter into this agreement, Employer and Owner grant to Employee the option to purchase forty-nine (49%) percent of the outstanding shares of Employer's stock to be exercised as follows:
 "(a) At the end of twelve (12) months of continuous employment with Employer by Employee, Employer [sic] shall have the right to purchase from Owner ten (10%) of the outstanding stock of Employer for the total price of TWENTY-FIVE THOUSAND AND NO/100 ($25,000.00) DOLLARS. Owner agrees to accept as payment for said stock, TEN THOUSAND AND NO/100 ($10,000.00) DOLLARS cash and finance the balance on terms to be agreed upon at the time.
 "(b) The balance of thirty-nine (39%) percent may be purchased by Employee for the total purchase price of THREE HUNDRED TWENTY-FIVE THOUSAND AND NO/100 ($325,000.00) DOLLARS in four (4) increments consisting of ten (10%) percent for each of the first three (3) increments and one (1) final increment of nine (9%) percent of the total outstanding stock. The first of such purchases may be made by Employee at the end of the second twelve month term of employment or at agreed upon extensions thereof, and one (1) increment may be purchased in each successive twelve (12) month period, or extension agreed upon. Employee shall have twelve (12) months in which to exercise each right to purchase granted in this agreement. The total purchase price for said thirty-nine (39%) shall be paid in four (4) equal increments of EIGHTY-ONE THOUSAND TWO HUNDRED FIFTY AND NO/100 ($81,250.00) DOLLARS to be paid at the time each increment of stock is purchased according to the terms hereof. Owner agrees to finance a part of the purchase price of each increment at the prevailing prime interest rate for a term to be agreed upon.
 "9. In the event of the death of Employee or the termination of this agreement prior to Employee acquiring forty-nine (49%) percent of the stock, Owner shall purchase all of the stock owned by Employee at the fair market value of such stock at the time of Employee's death or the termination of this agreement. Payment for such stock shall be made by Owner within six (6) months of the date of Employee's death or the termination of this agreement.
The trial court heard the case without a jury on 6 May 1981 and entered its judgment on the same day. The fair market value of the stock as of the pertinent date in question was fixed at $60,000 and judgment was entered for the sum of $64,200. Campbell was ordered to transfer the stock to Quick and deliver it to the register in chancery, who, in turn, was to deliver it to Quick upon satisfaction of the judgment. Quick then filed a motion for new trial that was denied, after which he timely perfected this appeal.
Quick says the construction given to the contract by the trial court is unconscionable and therefore is due to be reversed. The cases which he cites for this proposition, however, apply this rule only to situations where a contract is subject to more than one construction and is ambiguous. In that event, the courts may look to the conduct of the parties, the provisions of the contract and its subject matter in construing the contract to ascertain the intent of the parties, and give it a reasonable construction to avoid unconscionable results.Charles H. McCauley Associates v. Snook, 339 So.2d 1011 (Ala. 1976); GFA Peanut Association v. W.F. Covington PlanterCompany, 238 Ala. 562, 192 So. 502 (1939); InternationalHarvester Company v. Bostick's International, Inc.,365 So.2d 84 (Ala.Civ.App. 1978).
Quick points to no ambiguity or uncertainty in the contract; he only approaches the periphery of that argument when stating: "The contract itself states that the stock purchase agreement is an inducement to Campbell and sets a price for the first share at $25,000.00." Quick testified that it was his intention and belief that the value of that one share of stock was $25,000. The contract unambiguously says the stock is to *Page 267 
be repurchased at fair market value. The gist of this argument is that it is unjust to allow Campbell to "terminate the agreement by his own misconduct and reap a harvest of more than twice his investment in less than one year." Passing over the fact that Campbell denies any misconduct, we note it was Quick who terminated the agreement by giving Campbell the choice of quitting or being fired because of an incident that occurred in connection with a broadcast made shortly before Campbell's resignation was requested. Under the evidence in this case, neither is Quick an innocently wronged party, nor is the award so harsh as to be unconscionable.
Campbell produced the witness Thomas Averett, a certified public accountant, who used evaluation methods and formulae pertinent to closely held corporations, and to radio stations, in reaching a fair market value as of 17 March 1980 of $920,000 for New Decatur Radio, Inc., thereby arriving at a value of $92,000 for a 10% interest. The financial statements and tax returns of the company used in his evaluation support a value ranging from $75,000 to $90,000 for one share of stock. The employment agreement permits Campbell to buy the additional shares, representing a 39% interest, at approximately $83,000 per share. Campbell testified that Quick told him this was the value of the stock.
The mere fact that Quick offered Campbell a share of stock at a discounted value as an inducement to leave his work at another Decatur radio station does not necessarily fix the value of that share at $25,000. Quick cites cases in support of his argument that stock in the hands of a minority shareholder of a closely held corporation is not worth as much as that in the hands of a majority shareholder. Helvering v. Safe Depositand Trust, 95 F.2d 806 (4th Cir. 1938); Foglesong v. ThurstonNat. Life Ins. Co., 555 P.2d 606 (Okla. 1976). That is merely one fact to be taken into consideration when weighing the evidence concerning the value of the stock. It is not binding, and may be given such weight as the trial court is of the opinion it bears on the issues in the case. As a matter of fact, the evidence of record will support a much higher valuation of the stock than its value as determined by the trial court.
We find no error in the record; therefore the judgment is due to be and is hereby affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and ADAMS, JJ., concur.