**Brian R. DEVLIN, Plaintiff–Appellant,**

**v.**

**Jerry G. INGRUM and International Integrated Systems, Inc., Defendants–Appellees.**

**No. 90–7046.**

United States Court of Appeals, Eleventh Circuit.

April 17, 1991.

D. Charles Holtz, Wilkins, Druhan, Ollinger & Holtz, Mobile, Ala., for plaintiff-appellant.

Robert T. Meadows, Walker, Hill, Adams, Umbach & Meadows, Opelika, Ala., for defendants-appellees.

Before CLARK and BIRCH, Circuit Judges, and HENDERSON, Senior Circuit Judge.

BIRCH, Circuit Judge:

In this contract case, coinventors of a patented device for detecting residue in beverages disagree as to whether they formed a contract regarding their rights and interests in the device. If their agreement is enforceable, then they contest the meaning of certain terms. Following a nonjury trial, the district court concluded that the parties had not entered into a binding contract. Our review of the record reveals that the parties did enter into a valid contract. We, therefore, reverse and remand this case to the district court to determine a disputed, ambiguous contract term and to ensure that the coinventors' rights have been transferred properly.

## I. BACKGROUND

Plaintiff-appellant Brian R. Devlin, a Canadian citizen residing in Alabama, and defendant-appellee Jerry G. Ingrum, both engineers in optical technology, worked for the same employer from 1976 to 1980. In 1984, Devlin formed Advanced Integrated Systems, Inc. (AIS), an Alabama corporation, as the marketing and sales agent for Phoenix Technology, Inc. (Phoenix), a manufacturer of optical instruments. In 1985, Devlin established another Alabama corporation, Roxburgh Corporation (Roxburgh). Devlin was the sole stockholder in AIS and Roxburgh. He agreed that Ingrum could work as a contract salesman for AIS in 1986.

In May, 1986, Phoenix began working with the "Company" [1] to develop a device to detect residue in nonalcoholic beverages.

Although the Company was interested in a device that AIS was marketing for Phoenix, that device did not meet the Company's requirements. Because of differences over commissions, AIS and Phoenix ceased doing business in October, 1986.

Thereafter, Devlin and Ingrum began work to create the device desired by the Company. Devlin refused to make Ingrum an AIS stockholder.[2] Subsequently, Devlin agreed to Ingrum's suggestion that a separate corporate entity be formed to do business as "Advanced Integrated Systems, Inc.," to be distinguished from and with no liability to AIS, the corporation in which Devlin was the sole stockholder. Devlin and Ingrum also incorporated defendant-appellee International Integrated Systems, Inc. (IIS), which did business under the name "Advanced Integrated Systems, Inc." Devlin was president and Ingrum was secretary of IIS. Initially, 45% of the IIS stock was issued respectively to Roxburgh and Ingrum and the remaining shares were held in treasury. Within a year, the 10% interest was issued to another individual.

In their effort to expedite the development of the device, Devlin and Ingrum involved another corporation to assist with the technology. Ingrum assumed communication and coordination responsibilities with this corporation, and Devlin and Ingrum communicated less frequently. The Company lost interest in the project, and it appeared that litigation might be necessary in order to compel the Company to fulfill its commitments to IIS.

To protect themselves, Devlin and Ingrum signed a general description of the device as coinventors on April 10, 1987.[3] In September, 1987, the other IIS stockholder and Ingrum removed Devlin as president of IIS and replaced him with Ingrum, who became the only officer, director or

---

1. The parties have entered into a court approved stipulation and protective order not to disclose the identity of the "Company."

2. Devlin represents that Ingrum asked to be made an "officer" of AIS. Appellant's Brief at 5. We note that the parties have used the terms "officer" and "stockholder" interchangeably in this litigation. Since ownership is the critical

issue in the transactions involved in this case, the fact that either Devlin or Ingrum had an ownership interest in a particular corporate entity is significant.

3. Basically, the residue detection device uses light energy to examine the content of various liquid substances.

stockholder of IIS negotiating with the Company. In November, 1987, Ingrum informed Devlin that IIS had reached a tentative resolution with the Company, and he mailed to Devlin a preliminary draft of the proposed settlement and release agreement. The Company was to pay $175,000 for an exclusive, worldwide license to utilize the device in the limited field of use of nonalcoholic beverages for three years.

On November 21, 1987, Devlin wrote Ingrum concerning the *"need to finalize contractually our arrangements* in terms of, division of [the Company] royalties and other monies owing and also my future participation with IIS." Plaintiff's Exhibit 16 at 1 (emphasis added). Since Devlin and Ingrum under the auspices of IIS had completed production of the device requested by the Company, Devlin designated the manner of disbursement of his share of the Company payments after satisfying costs and obligations, and stated their need to provide for distribution of their proceeds.[4] Regarding his involvement in IIS, Devlin specifically states: "Concerning my future participation in IIS, I would rather not continue and am quite prepared to either sell my stock to you or to the company." *Id.* at

2. Based upon his research and that of others, Devlin also states his belief that the residue detection device is "absolutely patentable" in generic terms and for specific applications. *Id.*

Ingrum discussed Devlin's memorandum with his brother Charles Ingrum, an attorney residing in Alabama. Thereafter, Ingrum sent his brother an undated letter regarding the preparation of an agreement to protect both Devlin and Ingrum. He sent a copy of this letter to Devlin. Informing his brother that Devlin desired to terminate his participation in IIS, Ingrum states that

> *[W]e have essentially agreed as follows:*
> 1. IIS will pay to Advanced Integrated Systems his [Devlin's] portion of the distributions from the initial payments due from [the Company]; a copy of the accounting has been forwarded to him for review.
> 2. IIS will pay to Roxburgh corporation his interests in the future royalties and or license fees as follows:
>> a. $202,500.00 lisense [sic] fee for each year [the Company] elects to extend their exclusive license beyond the three year period granted under the IIS/[Company] agreement.

**4.** In pertinent part, Devlin's November 21, 1987 memorandum regarding the Company's payment to IIS and his subsequent distribution by IIS as well as his requested manner of payment states as follows:

> As agreed, this project with the acceptance of the recently received contract concludes our participation in residue detection with [the Company] for a *staggered payment of monies* for manufacturing rights and also options for exclusivity for the technology over an extended period of time which will be in excess of 5 years. The arrangement involves several payments of which we have agreed to split on a 50% basis after all costs and obligations are met. My portion of this $175,000 would be best handled if it is paid directly from IIS to Advanced Integrated Systems. The remaining 50% portion of the royalties upon manufacture of the 51st. instrument are to go to The Roxburgh Corporation where they will be transferred to a trust fund, both accounts administered by a local Mobile firm. My 50% portion of the $450,000 per year optional payment for technology exclusivity protecting the [Company] due January 1, 1992 would also go directly to The Roxburgh Corporation. Because neither of us can be certain what the future brings and because of the unlikely but

possible amounts of money involved, we both need protection so that their [sic] can be no mistake about the intent of our agreements by third parties. Should something happen to me and/or you, I do not want this to have any consequence on the funds owing nor their dispersement. As coinventors of the instrument, we should receive the compensation, not the government, or any other third party and the [Company] should not be allowed to discontinue payment for any reason other than what is stipulated in the contract, regardless if IIS is dissolved or goes bankrupt or any other such event.

Plaintiff's Exhibit 16 at 1. In their individual and corporate relationships concerning their rights and interests in the device, both Devlin and Ingrum have interchanged and confused their individual interests with their ownership interests in IIS, Devlin's interest in Roxburgh and AIS, and their interests and rights as coinventors of the device. They appear to have used IIS as the conduit for their coinventor, or joint intellectual property, rights in the device. Furthermore, Devlin and Ingrum ignore the interest of the 10% IIS stockholder regarding the Company's payment of funds to the corporate entity IIS.

b. Royalty payments per residue detector as follows:

Instrument 51–100     $ 675.00
Instrument 101–200    $1350.00
Instrument 201 and up   $2250.00

These payments are subject to maintaining at least one patent claim in the country of manufacture, use, or sale; therefore *Roxburgh will be required to contribute its pro-rata share of the patent costs; funds will be retained for the USA, and probably the Common Market; certainly Germany.*

3. IIS will pay AIS 25% of the net profit from any development contracts from [another company which desired to use the device for alcoholic beverages and was the only other prospective customer] and 12.5% on sales to [that company].

4. *Rosburgh [sic] Corporation will assign to IIS its 450 shares in IIS, and Brian [Devlin] agrees to a noncompetitive arrangement for as long as any portion of the agreement is in effect.*

Please realize this is not an adversarial type agreement and that you are not representing me against Brian, but is being done to protect us both against future unknowns, so please use your good judgment in seeing that we are both protected.

Plaintiff's Exhibit 18 at 1–2 (emphasis added).

On December 2, 1987, Ingrum mailed an accounting to Devlin. This accounting lists under receivables the initial $175,000 to be paid by the Company. A payable account of $6,000 is shown for patent reserve and net distributions of $30,211.25 each to Devlin and Ingrum. The amount of $15,000 was to be retained for contingencies.

On behalf of IIS, Ingrum executed a Settlement and Release Agreement (Agreement) with the Company on December 11, 1987. The Agreement refers to IIS, an Alabama corporation doing business as AIS, as "IIS/AIS," which is defined to include "each of its predecessors, successors, and assigns, and each of its ... past and present ... officers, directors [and] shareholders...." Plaintiff's Exhibit 15 at 11. The stated purpose of the Agreement is "to release fully and unconditionally any and all claims" that the Company and IIS had or may have against each other arising from their dispute concerning the parties' respective commitments to compensate and to develop, test and commercially produce the residue detection device as well as the related industrial and intellectual property rights covering the hardware and software. *Id.* at 1. As consideration for the release, the Company agreed to pay $75,000 upon execution of the Agreement and incremental payments totalling $100,000 within five months pending delivery and successful functioning of the residue detection device.

In return, IIS purports to grant to the Company "a worldwide, irrevocable, exclusive license" to use and sell the device "in the field of non-alcoholic beverages" from January 1, 1988 until December 31, 1990, with the option to extend the exclusive license annually from January 1, 1991 through December 31, 1997, upon payment of $450,000 per year. *Id.* at 3–4. Without renewal, the Company would have a nonexclusive license, limited to the nonalcoholic beverage field of use. The Company also agreed to pay graduating royalties up to $5,000 for each device "covered by one or more valid claims of a valid and enforceable patent owned or controlled by IIS/AIS in the country of manufacture, sale or use of each such Residue Detection Device." *Id.* at 5. During the Company's period of exclusivity, if IIS/AIS makes the device available to any third party for a use similar to that licensed to the Company, such use would "be subject to a paid up license by any such third party restricting use of such device in the field of nonalcoholic beverages." *Id.* at 7.

Regarding the technology ownership, the key Agreement provision precluding transfer of rights states as follows:

Except for licenses granted by IIS/AIS to COMPANY, all rights, titles and interests in and to technology related to the pre-prototype device including any patent, trademark, copyright, trade secret,

confidential information, know-how or other intellectual or industrial property right thereon including any such right arising from technology developed during testing of the pre-prototype device by COMPANY in COMPANY'S pilot plant with the assistance of IIS/AIS shall be owned by IIS/AIS, provided all such technology is created and/or discovered solely by employees of IIS/AIS.

*Id.* at 7. IIS/AIS warranted to the Company in the Agreement that no claims, including claims of AIS, Devlin, Ingrum, or Roxburgh, existed to limit the ability of IIS/AIS to perform any of its obligations to the Company under the Agreement.[5] The Agreement also contains a confidentiality provision regarding the Company's obligation not to reveal the technology of the device to another person or entity.

On February 3, 1988, IIS and Roxburgh entered into a stock transfer agreement, drafted by Ingrum's attorney brother who prepared the document based on the information contained in Ingrum's letter to him. The stock transfer agreement, signed by Ingrum on behalf of IIS and Devlin on behalf of Roxburgh and AIS, states as follows:

> THIS AGREEMENT made and entered into on this the 3 day of Feb, 1988, by and between International Integrated Systems, Inc., hereinafter referred to as Party of the First Part; Roxburgh, Inc., hereinafter referred [to as] Party of the Second Part, and
>
> *FOR AND IN CONSIDERATION of Roxburgh, Inc., Party of the Second Part's, 450 shares of stock in International Integrated Systems, Inc., conveyed to the Party of the First Part,* the Parties hereby agree by and between themselves as follows:
>
> (a) [The Company] Contract, Exhibit A [the Agreement], which is attached hereto and made a part hereof by specific

reference thereto is owned entirely by International Integrated Systems, Inc.

> (b) Unless future negotiations with [the Company] change or circumstances cause the Agreement with [the Company] to change Roxburgh, Inc., will receive 45% of the royalties as set out in Exhibit "A" attached hereto. In any event, Roxburgh, Inc., will receive a sum equal to 45 percent of the gross royalties as set out in any other Agreement as to royalties that may be entered into in the future concerning the Agreement with [the Company] and *the royalties that are* to [be] paid theretounder for the technology, interlectual [sic], software, and industrial property.
>
> (c) This agreement to [sic] Roxburgh, Inc., shall be forwarded to [the Company] and become a permanent part of [the Company] agreement with International Integrated Systems, Inc.

Plaintiff's Exhibit 19 (emphasis added). Pursuant to the stock transfer agreement, Roxburgh delivered its stock to IIS and received between $25,000 and $30,000. IIS subsequently sold Devlin's stock to new IIS stockholders.

In addition to the stock transfer agreement, Ingrum, on behalf of IIS, and Devlin, on behalf of AIS, executed a sales and commission agreement for the payment of proceeds by IIS to AIS in the event of the completion of successful negotiations that had begun between IIS and another company to use the residue detection device for alcoholic beverages. On March 16, 1988, the IIS patent attorney sent to Devlin for execution documents regarding the patent application for the residue detection device. These documents included an irrevocable assignment of *all* Devlin's rights in the device to IIS. Protesting that this assignment was broader than he had agreed to make, Devlin refused to execute the assignment. Devlin contends that he agreed to transfer to IIS, which in turn would license to the Company, his rights in the residue

---

5. For this warranty to be valid, both Ingrum and Devlin would be required to transfer to IIS d/b/a AIS the portion of their respective coinventor's rights in the device sufficient to allow IIS to grant the exclusive, worldwide, irrev-ocable license to use the device in the nonalcoholic beverage field of use for the period established in the Agreement. *See* 35 U.S.C. §§ 154, 261–262.

detection device for the nonalcoholic beverage field of use *only*, and not for other uses of the device.

In a letter dated April 15, 1988, Ingrum requested that Devlin assign all of his rights in the device to IIS. Ingrum represented that Devlin's assignment was a requirement of the IIS Agreement with the Company, and that "the entire expense of obtaining the [patent] application" had been paid by IIS. Defendant's Exhibit 4 at 1. Without this assignment, Ingrum informed Devlin that IIS would not transfer to Roxburgh its 45% share of the Agreement proceeds. Devlin never executed that assignment. Thereafter, Devlin submitted a proposed limited assignment providing that he would transfer his rights to the device for nonalcoholic beverages as required by the Company under the Agreement for as long as the Company was entitled to those limited, exclusive rights. Devlin dissolved Roxburgh and AIS in October, 1988.

This diversity action concerns the contract, including specific agreement terms, between Devlin for Roxburgh and Ingrum for IIS. The case was tried in one day before the district court without a jury. Devlin and Ingrum were the only witnesses. Both agreed at trial that the terms of their putative contract are contained in four documents: the November 21, 1987 memorandum from Devlin to Ingrum, the undated letter from Ingrum to his attorney brother Charles Ingrum, the February 3, 1988 stock transfer agreement, and Agreement the Company and IIS incorporated by reference in the stock transfer agreement as Exhibit A. The parties dispute the extent of Devlin's contemplated transfer of his rights as a coinventor and Devlin's liability for costs of obtaining patents. These expenses have exceeded the costs originally anticipated to have been covered by the $6,000 plus the contingency reserve from the $175,000 paid by the Company.

Although each side had planned to present patent attorneys as expert witnesses, the district court determined that "neither one of you will need your patent experts...." R3–31. In overruling an objection regarding Ingrum's testimony concerning patent costs, the district court allowed the testimony, stating that "it may have some relevance as showing that this is a substantial part of the contract." R4–23. In its subsequent opinion, the district court found that the parties had made no provision for escalating patent costs, particularly in foreign markets, and that they had not agreed with specificity upon the extent of the assignment of patent rights. With respect to the patent costs and patent assignment, the district court decided that "[q]uite obviously, the two terms are material or else the parties would not have so fiercely contested them." R2–52–12. Therefore, the district court concluded that "there was never a meeting of the minds" and "that no contract was entered into between Plaintiff Devlin and Defendant Ingrum...."[6] *Id.* at 13, 16. Furthermore, the court concluded that it did not "have the power to make a contract for the parties or to enforce only certain provisions of an incomplete contract...." *Id.* at 14. Judgment was entered accordingly, and the district court denied Devlin's motion for a new trial.[7]

**6.** The district court's conclusion that Devlin and Ingrum had not formed a contract regarding the residue detection device is contrary to the court's statements during trial:

THE COURT: Well, you have spent an hour trying to prejudice me against the other side, whereas an agreement supersedes these things. And I think there was an agreement later on, wasn't there? R5–40.

THE COURT: All right. They both had some input and they reached an agreement based on what they thought was right at the time. And we have wasted an hour getting to that. You should have stipulated to that. R5–42.

THE COURT: Well, it just seems to me that the whole thing can be disposed of, all that business before the agreement, can be disposed of by my saying in an order, "For reasons satisfactory to themselves, these two parties entered into the following agreement." R3–28.

**7.** Devlin's motion for a new trial contended that the judgment was not final because the district court had stated at the pretrial conference that it would conduct a bifurcated hearing on the accounting claim subsequent to trial on the main issues and that such a hearing had not transpired. In denying Devlin's motion for a

## II. DISCUSSION

On appeal, three issues are presented. First, we must decide whether the parties entered into an enforceable contract. Second, the extent of Devlin's transfer of his coinventor property rights in the residue detection device must be established. Third, the parties' agreement regarding patent costs must be determined. Clearly, the first issue governs the disposition of the second and third issues. As we will explain, the first and second issues only are capable of our determination. Consequently, our analysis will be confined to whether the parties' rights and interests are controlled by a valid contract and the extent to which Devlin relinquished his rights in the residue detection device to IIS.

A district court's determination regarding the existence of a valid contract "will not be not be set aside unless clearly erroneous." *Trustees of Atlanta Iron Workers v. Southern Stress Wire Corp.*, 724 F.2d 1458, 1459 (11th Cir.1983) (per curiam). "The clearly erroneous standard of review applies to both subsidiary and ultimate facts." *Matthews v. United States*, 713 F.2d 677, 681 (11th Cir.1983). Concerning the existence of a contract, this court has recognized that "it is logical for the reviewing court to treat ultimate facts as matters of law that it may determine independently." *Augusta Aviation, Inc. v. United States*, 671 F.2d 445, 447 (11th Cir. 1982) (citing *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 526, 81 S.Ct. 294, 297, 5 L.Ed.2d 268 (1961)). Thus, we will perform our own analysis of Devlin and Ingrum's contract formation.

■ Alabama courts "have long recognized a presumption in favor of the validity of a contract, especially when attacked for uncertainty." *Industrial Machinery, Inc. v. Creative Displays, Inc.*, 344 So.2d 743, 747 (Ala.1977). The necessary elements of a valid contract are: "(1) an agreement, (2) with consideration, (3) between two or more contracting parties, (4) with a legal object, and (5) legal capacity." *Gray v. Reynolds*, 514 So.2d 973, 975 (Ala.1987). The intention of the parties at the time of making the contract controls, not subsequent perceptions. *Vester J. Thompson, Jr., Inc. v. Citmoco Servs., Inc.*, 371 So.2d 35, 40 (Ala.Civ.App.1977), *rev'd on other grounds*, 371 So.2d 42 (Ala.1978) (per curiam); *see United States v. Seventy–Seven Acres of Land*, 88 F.Supp. 349, 351 (S.D. Ala.1950); *see also Smith v. Citicorp Person–To–Person Fin. Centers, Inc.*, 477 So.2d 308, 310 (Ala.1985) (The intent of the parties at the time of contracting is derived from the written provisions of the contract.).

■ It is undisputed that two or more contracting parties with legal capacity, Devlin and Ingrum, contracted concerning the residue detection device, the legal object in this case. As consideration, Devlin caused Roxburgh to transfer all of its IIS stock in exchange for the expectation of a 45% share of the proceeds of the IIS Agreement with the Company. Additionally, Devlin agreed to transfer so much of his patent rights as was necessary to effectuate the Agreement.[8] Significantly, both Devlin and Ingrum testified at trial that the letter from Ingrum to his brother constituted the basic terms of their contract concerning their individual rights and interests as coinventors of the residue detection device.[9]

---

new trial, the district court ruled that its conclusion that no contract existed between the parties mooted the need for a hearing on the bifurcated accounting issue.

**8.** Devlin apparently viewed the transaction in stages, with his ultimate share of the Agreement proceeds being paid to him through the conduit of his wholly owned corporation, Roxburgh. Although a noncompetition agreement originally had been contemplated as part of Devlin's consideration, such an agreement has not been executed between Devlin and Ingrum. The con-

templation of such an agreement apparently reflected Ingrum's recognition that Devlin would need to relinquish some of his coinventor rights to effectuate the terms of the Agreement.

**9.** Concerning Plaintiff's Exhibit 18, the letter from Jerry Ingrum to his attorney brother Charles Ingrum, the cross-examination of Devlin is as follows:
*Q. Then we have Plaintiff's Exhibit 18, which is the document from Jerry Ingrum to Charles Ingrum basically setting forth what he conceived to be you all's agreement?*

Furthermore, the stock transfer agreement, drafted by Charles Ingrum after receiving his brother's letter, was signed by both Devlin and Ingrum for their respectively controlled companies. Based upon the execution of the stock transfer agreement, Roxburgh transferred its 450 shares of IIS stock to IIS, which sold these shares to new stockholders. By the district court's finding that the parties have not formed a contract, Devlin has no right to any proceeds under the Agreement between the Company and IIS, which is the only other party to the Agreement.[10]

A. Yes.

Q. You received a copy of that, did you not?

A. Yes.

Q. And you had an opportunity to review that. Is that correct?

A. Yes, sir.

Q. Did you make any changes in it or did you discuss with Jerry [Ingrum] anything that indicated to you ... or that you thought was in error on that letter?

A. I don't recall. I may have had some verbal comments on minor issues. *But the basis for the agreement was there; all the important parts.*

R3–67 (emphasis added). Similarly, Ingrum testified on direct examination as follows regarding the same letter to his attorney brother:

Q. Now, in December of 1987 after you received Plaintiff's Exhibit 16 [Devlin's memorandum to Ingrum], did you have an occasion to discuss by telephone with Mr. Devlin an agreement, or proposed agreement, between you and him and IIS and AIS and Roxburgh?

A. Yes, we did.

Q. Plaintiff's Exhibit 18 purports to be a letter from you to your brother, Charlie Ingrum?

A. Yes, it is.

Q. *Does that letter set forth some of the terms of the agreement as you understand them to be?*

A. *Yes, sir.*

Q. Would you tell the Court, please, sir, in substance, what you understood the agreement to be as of December of '87?

A. Well, we had discussed it on the phone. We agreed that I would give Charlie some instructions as to what we wanted to cover to just take care of both of us.

. . . .

Q. *That letter, Plaintiff's Exhibit 18, basically sets forth the major components—*

A. *Yes, sir, it does.*

R4–9–11 (emphasis added).

**10.** Devlin envisioned using Roxburgh to receive his proceeds resulting from the Agreement between IIS and the Company. More importantly, Devlin would have received no consideration for any transfer, albeit partial, of his patent rights as a coinventor to IIS. This transfer was

There has been partial performance of the contract under the basic terms to which both parties agreed at the time of contracting, and the status quo cannot be reinstated because IIS has sold Devlin's stock that he caused Roxburgh to return to IIS in return for a 45% share of the proceeds from the Agreement between IIS and the Company.[11]

■ Clearly, Devlin and Ingrum as coinventors deliberately contracted regarding their rights and interests in the residue detection device.[12] They subsequently

necessary for IIS to perform and to receive proceeds under the Agreement. *See* 35 U.S.C. § 261–262.

**11.** Cases in which Alabama courts have determined that no contract exists, or no "meeting of the minds" has been found, involve situations where there was no mutually executed document, such as the stock transfer agreement in this case. *See, e.g., Erika, Inc. v. Blue Cross & Blue Shield,* 496 F.Supp. 786 (N.D.Ala.1980); *Board of Comm'rs v. Jones,* 291 Ala. 371, 281 So.2d 267 (1973) (per curiam); *Griffin v. Hardin,* 456 So.2d 1113 (Ala.Civ.App.1984); *Sunnyland Mobile Homes, Inc. v. Thompson,* 384 So.2d 1111 (Ala.Civ.App.1980). Although both parties sign a document, no contract has been found when the execution constitutes an agreement to make a contract in the future. *See Dixieland Food Stores, Inc. v. Geddert,* 505 So.2d 371 (Ala. 1987). Additionally, no contract has been found when disagreement occurs at the offer and acceptance stage. *See Wright v. Schwerman Trucking Co.,* 555 So.2d 1119 (Ala.Civ.App. 1989). It is evident that these situations are not present in this case.

**12.** "Under the law of patents, the owner of a patent receives a limited monopoly in his or her invention, that is, an exclusive right to make, use and sell the invention or discovery." *Robb Container Corp. v. Sho–Me Co.,* 566 F.Supp. 1143, 1156 (N.D.Ill.1983) (citing *United States v. Univis Lens Co.,* 316 U.S. 241, 250, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942)); *see* 35 U.S.C. § 154 (The monopoly period is limited by statute to seventeen years.). A contract, regarding the rights of coinventors Devlin and Ingrum as to IIS, was necessary in order for IIS to grant an exclusive license to the Company under the Agreement to use the device for the nonalcoholic beverage field of use, even for a brief period of time. *See* 35 U.S.C. §§ 154, 261–262. When a

patent is granted to two inventors, then the relationship created is a co-tenancy. It is true that the co-tenancy under principles of patent

have advanced different meanings of the patent costs and scope of transfer language contained within the constituent documents that comprise their contract. Ingrum's letter to his brother, which both Devlin and Ingrum agree constitutes the material terms of their contract, states as follows concerning Roxburgh's responsibilities regarding patent costs and Devlin's obligations relative to his coinventor rights: "Roxburgh will be required to contribute its pro-rata share of the patent costs; funds will be retained for the USA, and probably the Common Market; certainly

> law differs somewhat from usual common law co-tenancies and presents such anomalies that the Circuit Court of Appeals for this Third Circuit has said "Joint owners of a patent are at the mercy of each other." One may use the patent or license others to so use without liability to other owners but a suit for infringement must be brought by all co-owners.

*Turchan v. Bailey Meter Co.*, 19 F.R.D. 201, 204 (D.Del.1956) (footnotes omitted). Therefore, an agreement between IIS and the Company for the Company to utilize the device exclusively for the nonalcoholic beverage field of use would not have been possible without Devlin's transfer to IIS of his coinventor rights as to that field of use. This necessity was the probable reason that Ingrum, on behalf of IIS, wanted a non-competition agreement from Devlin for the period that the Agreement was effective. In their subsequent negotiations, the parties recognized the need to transfer to IIS Devlin's rights as well as those of Ingrum as to the field of use proposed for transfer by IIS to the Company through an exclusive license.

In the seminal case of *Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), the Supreme Court distinguishes an assignment and a license:

> Every patent issued under the laws of the United States for an invention or discovery contains "a grant to the patentee, his heirs and assigns, for the term of seventeen years, of the exclusive right to make, use and vend the invention or discovery throughout the United States and the Territories thereof." The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. *Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement.*

138 U.S. at 255, 11 S.Ct. at 335 (citations omitted) (emphasis added). "*Waterman* stands for the proposition that the name given the instrument is not determinative and that the true test is its 'legal effect.'" *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 844 (9th Cir.1976) (citing *Waterman*, 138 U.S. at 256, 11 S.Ct. at 334). A patentee need not release all of his rights in the patent when he enters into a license agreement. *See Bement v. National Harrow Co.*, 186 U.S. 70, 88–89, 22 S.Ct. 747, 754, 46 L.Ed. 1058 (1902); *Sherman Theaters, Ltd. v. Ahlbrandt*, 607 F.Supp. 939, 944 n. 3 (D.D.C.1985), *aff'd mem.*, 785 F.2d 322 (Fed.Cir.), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 185 (1986). In this case, Devlin and Ingrum have misnamed and misunderstood the rights that they needed to relinquish to license the Company to use the device exclusively in the nonalcoholic beverage field of use. They have used the term "assignment" instead of "transfer" to describe the coinventor rights that they needed to relinquish to give the Company an exclusive license for the nonalcoholic beverage field of use. The Company wanted a license in this field of use; no assignment of their coinventor rights in the patent was necessary. The minimum transfer of coinventor rights required to effectuate the Agreement between IIS and the Company appears to be a grant of a license to IIS of each coinventor's exclusive, worldwide right to use the device in the nonalcoholic beverage field of use for the period of the Agreement, including renewals, with a right granted to IIS to sublicense to the Company only. *See generally* 6 Lipscomb's Walker on Patents ch. 20 (E. Lipscomb 3d ed. 1987) (discussing all aspects of patent licensing).

While not specifically stated in the Agreement in this case, IIS implicitly and clearly reserved the right to use the device in other fields because it was negotiating a contract with another company to use the device for alcoholic beverages. Although the Agreement granted the Company an exclusive license for nonalcoholic beverages, it did not embrace other uses of the device. *See Gilson v. Republic of Ireland*, 787 F.2d 655, 658 (D.C.Cir.1986) ("It is well settled that a nonexclusive licensee of a patent has only a personal and not a property interest in the patent and that this personal right cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment."). In this case, the exclusivity provision in the Agreement relates solely to the particular field of use licensed.

Germany.... Rosburgh [sic] Corporation will assign to IIS its 450 shares in IIS, and Brian [Devlin] agrees to a non-competitive arrangement for as long as any portion of the agreement is in effect." Plaintiff's Exhibit 18–1–2.

The interpretive complications arose when IIS confronted escalating patent costs, exceeding the original amount designated for that purpose from the $175,000 payment by the Company,[13] and discovered the potential for contracting with other companies for use of the residue detection device. The ambiguities exist in Ingrum's letter to his brother and in the stock transfer agreement, drafted by Ingrum's attorney brother. Devlin claims that the parties' contract did not include his additional contributions for patent costs and that his transfer of patent rights, which he has been prepared to make, was for the restricted and exclusive license to the Company to use the residue detection device for nonalcoholic beverages only. "As a general rule, whether or not a written contract is ambiguous is a question of law for the trial court." *Upton v. Mississippi Valley Title Ins. Co.*, 469 So.2d 548, 553 (Ala.1985). Once the trial court determines that a contract contains ambiguous terms, " 'it becomes a question for the factfinder to determine the true meaning of the contract.' " *Owen v. Rutledge*, 475 So.2d 826, 828 (Ala.1985) (quoting *Rivers v. Oakwood College*, 442 So.2d 74, 76 (Ala.1983)); *see Byrd Cos., Inc. v. Birmingham Trust Nat'l Bank*, 482 So.2d 247, 251 (Ala.1985) (Unless ambiguity is found in a contract, "there is nothing for us to construe.").

The district court recognized that Devlin and Ingrum "both had some input and *they reached an agreement based on what they thought was right at the time.*" R5–42 (emphasis added). The parties' subsequent disagreements concerning Devlin's payment of patent costs and the extent of his

relinquishment of rights as a coinventor are demonstrably superfluous to the agreed material terms of the contract. If the potential for excess patent costs had been considered a material term, then the parties would have provided for them. Ingrum testified at trial that, at the time he wrote his attorney brother the letter which the parties agree contains the terms of their contract, he had "no idea" what the patent costs would be. R4–11. Such an unforeseen and unrealized future contingency at the time of contracting can be resolved by reasonable contracting parties when the contingency occurs without nullifying the contract. *See O.N. Jonas Co. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir.1983) (per curiam) (This court reversed the district court's finding the quantity of the yarn term in a memorandum from a yarn manufacturer to a carpet manufacturer to be indefinite in a requirements contract "[b]ecause the evidence demonstrates that both parties intended a requirements contract based on ... [the carpet manufacturer's] good faith needs for the trademarked yarns, the indefiniteness of the written quantity term does not invalidate the agreement."). The district court can determine the parties' responsibilities for patent costs and uphold their contract.

■ Ingrum bases his argument that Devlin must assign *all* of his rights in the patent on one sentence in the Agreement to which Devlin was not a party: "In consideration of the making of this Agreement by IIS/AIS, for IIS/AIS' assignment to COMPANY of all rights, titles and interests in and to the pre-prototype device...." Plaintiff's Exhibit 15 at 5. That single sentence could be interpreted to be modified by multiple references throughout the Agreement to the Company's using the residue detection device solely in the nonalcoholic beverage field of use, the meaning asserted by Devlin.[14] For example, the

---

**13.** We are uncertain from the record whether the representation of excessive patent costs is actual or projected since no figures are stated.

**14.** At oral argument, Devlin's counsel suggested that the controversial Agreement sentence requiring all rights in the patent to be assigned to

the Company inadvertently remained from an earlier draft of the Agreement. He confirmed that Devlin would not have agreed to a complete assignment of all of his rights in the patent.

Agreement provides that "IIS/AIS hereby grants COMPANY a worldwide, irrevocable, exclusive license *in the field of non-alcoholic beverages*" to use and sell the residue detection device. Plaintiff's Exhibit 15 at 3 (emphasis added). To resolve conflicting contract terms, the Supreme Court of Alabama rejected the rule of contract interpretation that "the first in time should control" and decided that "the better rule is to determine the intent of the parties by considering the contract as a whole as well as the surrounding circumstances of the agreement." *Hester v. Miller,* 364 So.2d 1146, 1148 (Ala.1978).

Furthermore, the parties' stipulated facts in this case state that "the contract provided the Company with the exclusive right to the Device *in its area of business* for three years after the date of the contract...." R1–39–2 (emphasis added). Ingrum's letter to his brother, the document that the parties agree contains the material terms of their agreement, states that Devlin not only assigns Roxburgh's 450 shares of IIS stock, but also that Devlin "agrees to a non-competitive arrangement for so long as any portion of the agreement [with the Company] is in effect." Plaintiff's Exhibit 18 at 2. A noncompetition agreement would appear to be unnecessary if the intent of the contract had been that Devlin would assign all of his rights in the patent.[15]

Moreover, Devlin has yet to transfer any of his patent rights. He refused to execute the assignment drafted by Ingrum's patent attorney because it required the assignment of all his rights and interests in the patent. Nevertheless, the Agreement with the Company appears to be operating and generating royalties. At oral argument, the parties represented that they were approaching the first renewal of the Agreement with the Company following the initial three years that the Agreement had been in effect. Contrary to Ingrum's representation to Devlin, the assignment of all of Devlin's patent rights obviously is not a requirement for operation of the Agreement with the Company and IIS.[16] The inequity to Devlin, who is not a party to the Agreement, is that he has not received his share of the Agreement proceeds, which IIS apparently is withholding pending his assignment of all his patent rights.

The differing interpretations of the terms of the contract between Devlin and Ingrum regarding patent costs and transfer of coinventor rights do not constitute insurmountable obstacles to the parties' contract which partially has been performed. To the extent that ambiguities have occurred in these contract terms sub-

---

**15.** Ingrum apparently contemplated that some restriction must be placed on Devlin's equivalent right as a coinventor to practice freely any subsequently obtained patent in order to grant an exclusive, albeit, limited license to the Company. *See* 35 U.S.C. § 262.

**16.** IIS manifestly cannot convey a property interest, which it does not own, in the patent, or other intellectual property rights, for the residue detection device. Equally clear is that the scope of the transfer from coinventor Devlin to IIS, as well as a concomitant transfer from coinventor Devlin to IIS, need be only as broad as necessary to effectuate the basic intent of the Agreement; that is, a limited license restricted to nonalcoholic beverages. To effectuate the terms of the Agreement between IIS and the Company, the minimum transfer of Devlin's coinventor rights appears to be a worldwide, exclusive license to use the device in the nonalcoholic beverage field of use with a right accorded IIS to sublicense this restricted field of use to the Company only. A transfer by Devlin of all of his rights and title as a coinventor in and to

the device is not necessary to empower IIS to perform under the Agreement. *See Fawick v. Commissioner,* 436 F.2d 655, 662 (6th Cir.1971) ("The initial inquiry for determining whether or not there has been a transfer by the holder of 'property consisting of all substantial rights to a patent' requires consideration of what the holder has left after the transfer. If he retains any substantial rights to the patent, then he has not transferred the property that comprises all those rights."); *accord Kueneman v. Commissioner,* 628 F.2d 1196, 1199 (9th Cir.1980). Therefore, the ownership by IIS of all rights, title and interest in and to the device is not a material part of the Agreement between IIS and the Company.

Apparently, the Company never has required IIS to verify its representation that it owns all rights, title and interest in and to the intellectual property rights in the device. Nevertheless, the Company has performed fully under the Agreement. It appears that IIS improperly is attempting to use isolated language in the Agreement to divest Devlin of his rightful ownership as a coinventor in the patent rights in the device.

sequent to contracting, the district court, guided by the surrounding facts and circumstances and, with the aid of the parties and expert testimony at trial, can determine the intended and effective meaning of these contract terms.

To the extent that the terms of a contract are ambiguous, as a general rule such terms are nevertheless considered sufficiently certain if they are capable of being rendered certain or have been rendered certain by the performance of the parties under the contract. The meaning of such terms is a question of fact for the jury, to be decided by the surrounding facts and circumstances.

*Shirley v. Lin,* 548 So.2d 1329, 1332 (Ala. 1989) (citations omitted); *see Deeco, Inc. v. 3–M Co.,* 435 So.2d 1260, 1262 (Ala.1983) ("The existence *vel non* of a contract is determined by reference to the reasonable meaning of the parties' external and objective manifestations of mutual assent. Conduct of one party from which the other may reasonably draw the inference of assent to an agreement is effective as acceptance."); *Charles H. McCauley Assocs., Inc. v. Snook,* 339 So.2d 1011, 1015 (Ala. 1976) (Difficulty in ascertaining the meaning of contract terms "does not relieve the court of its duty to resolve the controversy caused by conflicting interpretations arising from ambiguous and uncertain language; nor is the court relieved of its duty to enforce the terms of the contract according to its interpretation of the intent of the contracting parties."); *Flagg–Utica Corp. v. City of Florence,* 275 Ala. 475, 480, 156 So.2d 338, 342 (1963) (per curiam) (When contract terms are ambiguous, "the courts will look at the surrounding circumstances, at the situation of the parties, and the subject matter of the contract for aid in giving a construction to its language.").

The Supreme Court of Alabama has noted that an agreement

consists of mutual expressions; it does not consist of harmonious intentions or states of mind.... It is by the conduct of two parties ... that we must determine the existence of what is called agreement. That is what is meant by the anciently honored term "meeting of

the minds." ... [One] may be "bound" by a contract in ways that he did not intend, foresee, or understand. The juristic effect (the resulting legal relations) of a man's expressions in word or act may be very different from what he supposed it would be.... [B]ut it is of much greater importance to realize that the courts must determine the requirements of justice and that the legal effects thus given to expressions of agreement are seldom exactly what one or both of the agreeing parties supposed or expected.

*Lilley v. Gonzales,* 417 So.2d 161, 163 (Ala. 1982) (quoting A. Corbin, Corbin on Contracts § 9 (1952)). The Alabama Supreme Court also has instructed that

Courts are loath to strike down a deliberate contract because of supposed uncertainty in any of its terms; and, if any of these terms are ambiguous and prima facie capable of more than one meaning, the court will look to the situation of the parties and the objects they had in view to determine their true meaning. Especially will the court in such cases construe doubtful terms against the party who framed them, and who is offering or undertaking to do the things in question.

*Hamilton v. Stone,* 202 Ala. 468, 469, 80 So. 852, 853 (1919); *see Rivers,* 442 So.2d at 76 ("[I]t is axiomatic that ambiguities should be interpreted most strongly against the party drawing the contract."). In this case, Ingrum wrote to his attorney brother the letter that the parties concede memorializes the terms of their contract. Furthermore, Ingrum's brother drafted the stock transfer agreement under which Roxburgh transferred to IIS its stock in return for 45% of the proceeds under the Agreement. Collaterally, Devlin, the sole owner of Roxburgh, implicitly agreed to transfer as much of his intellectual property rights as was necessary to allow IIS to perform under the Agreement with the Company.

■ Contrary to the district court, we conclude that Devlin and Ingrum did form a viable contract regarding their rights and interests in the residue detection device, and that it was clearly erroneous for the

district court to determine otherwise. Under the circumstances, we also conclude that Devlin's proffered transfer of a limited interest in his patent rights to the device would satisfy his obligations to IIS regarding this aspect of the consideration contemplated by the parties. Nevertheless, this court cannot interpret the ambiguous term of patent costs, a task for the finder of fact. Because the district court determined that the parties had not formed a contract, it did not address this controversial term. Upon remand, the district court should follow the contract principles that we have reviewed and construe the disputed cost provision based upon the evidence presented.

Although the district court found that no contract exists between Devlin and Ingrum, the Agreement with IIS and the Company remained, and it may continue to be, operative. The district court effectively has awarded all royalty and settlement payments resulting from the Agreement to IIS, an entity in which Devlin no longer has any interest because he caused Roxburgh to transfer its stock to IIS in exchange for a 45% share of the Agreement proceeds.[17] "Contracts will not be construed so as to render them oppressive or inequitable as to either party or so as to place one of the parties at the mercy of the other, *unless it is clear that such was their manifest intention at the time the agreement was made.*" *G.F.A. Peanut Ass'n v. W.F. Covington Planter Co.*, 238 Ala. 562, 566, 192 So. 502, 506 (1939) (emphasis in original); *Quick v. Campbell*, 412 So.2d 264, 266 (Ala.1982) (When confronted with ambiguous contract terms, "courts may look to the conduct of the parties, the provisions of the contract and its subject matter in construing the contract to ascertain the intent of the parties, and *give it a reasonable construction to avoid unconscionable results.*" (emphasis added)).

We have determined that Devlin and Ingrum have entered into a valid contract. "While the court cannot make contracts for the parties, it must give their agreements a reasonable construction." *Smiths Water Auth. v. City of Phenix City*, 436 So.2d 827, 830 (Ala.1983). We have concluded that the parties' contract has not been rendered ineffective because the subsequently disputed patent costs and transfer of coinventor rights terms were not material at the time of contracting, as we have discussed herein, and that these contract terms are capable of determination. We have decided the extent to which Devlin must transfer his coinventor rights in the prospective patent and instruct the district court to implement this transfer as well as to resolve the parties' liability for patent costs.

Upon remand, the district court should ensure that Devlin and Ingrum transfer sufficient rights owned by them as coinventors to IIS for an adequate period of time to allow IIS to perform legally under its Agreement with the Company to accord the Company a limited sublicense to use the residue detection device for nonalcoholic beverages. Furthermore, the district court must make certain the respective responsibilities of the parties for patent costs.[18] The district judge concluded that the patent costs and assignment terms were essential and, thus, prevented the parties' contract, but found that the testimony of the parties respective patent experts was unnecessary. Such expert opinions likely would be helpful to the court in determining an accounting regarding patent costs. The court is "entitled to have all the facts and circum-

17. At oral argument, Devlin's counsel represented that any contract determined by the court, even a contract on Ingrum's terms, would be more equitable to Devlin than no contract. We observe that an ultimate finding that no contract exists between Devlin and Ingrum probably would not resolve the differences between the parties, but would engender additional litigation.

18. It is unclear to us from the record what patents, if any, IIS currently owns. We would expect the district court not only to make this determination, but also to assess the need to provide for the costs of obtaining patents in other countries in which the Company plans to use the device. While the district court must make the determination as to the parties' liability for patent costs, we suggest exploration of the possibility that IIS advance the funding for patent costs with the expectation of deducting Devlin's pro rata share from its distribution of the Company proceeds to him.

stances going to show the conditions under which the parties contracted and what influenced them, to the end that the contract may be construed to give it such effect as the parties intended." *Flagg–Utica*, 275 Ala. at 480, 156 So.2d at 343. We are confident that the district court can make these determinations and, thereby, prevent the inequity of voiding a negotiated, partially performed contract, the material terms upon which the parties have agreed.

Accordingly, we REVERSE the judgment of the district court and REMAND this case for proceedings consistent with this opinion.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before HATCHETT and CLARK, Circuit Judges, and FITZPATRICK *, District Judge.