This appeal by McCauley Associates, Inc., challenges an adverse interpretation of a buy-sell agreement whereby the trial Judge awarded Eula M. Snook, the widow and personal representative of Charles Snook, the deceased president of McCauley, a judgment for the adjusted book value of the stock, plus life insurance proceeds.
 The Facts
Five employees of Charles H. McCauley Associates, including Mr. Snook, purchased the defendant corporation soon after Mr. McCauley's death in 1971 by paying $9,200 each and borrowing in the name of the corporation an additional $800,000. Their personal guaranty of this loan was backed up by the purchase of $160,000 insurance policy on the life of each stockholder. Each policy, subsequently increased to $250,000, was owned by McCauley and listed McCauley as sole beneficiary.
Shortly thereafter, all five stockholders executed a buy-sell agreement, the pertinent provisions of which are:
 "2. In the event of the death of any stockholder, the Company agrees that it will purchase all of the stock owned by said Stockholder at his death and the personal representative of said deceased *Page 1013 
Stockholder shall be obligated to sell said stock to the Company at the price and upon the terms and conditions hereinafter set forth.
 "(a) In the event the Company shall be the holder of any life insurance upon the life of the deceased Stockholder, the proceeds of which are payable to the Company, that portion of the proceeds which is in excess of the deceased stockholder's share of any corporate indebtedness endorsed by him, shall be paid by the Company to the personal representative of the deceased Stockholder within thirty (30) days after receipt from the insurer in part payment of the purchase price of the stock of said deceased Stockholder.
 "(b) In addition, the purchase price of said stock shall be the book value of said stock as shown by the most recent Company Balance Sheet adjusted as follows:
 "Book value as shown by said most recent Balance Sheet which shall be adjusted by adding thereto all receivables due the Company on the last day of the month immediately preceding the date of death of the deceased Stockholder, less a reasonable and proper adjustment for bad debts and less accounts payable of the Company."
Mr. Snook died on December 10, 1973. As of November 30, 1973, the initial indebtedness of $800,000 had been reduced to $540,000, and an additional payment of $240,000 was credited by the bank on December 10, 1973. Out of the total life insurance proceeds of $250,986.54, McCauley paid: (1) $190,986.54 to the Snook estate; and (2) $60,000 to the bank — 1/5 of the $300,000 indebtedness as of December 10. A November 30 balance sheet was furnished by McCauley to Mrs. Snook showing a corporate book value of $609,437, with the estate's shares of stock being worth $121,887.40.
 The Judgment Below
Upon the completion of an extensive ore tenus hearing, the trial Court, having concluded that the 1971 agreement was binding on the parties, found:
 ". . . that the Buy And Sell Agreement expressly fixes the amount of money to be paid for said stock as follows:
 "(1) The insurance proceeds upon the life of decedent less his pro rata share of any indebtedness to the Bank, and
 "(2) The book value of his stock ownership as shown by the most recent balance sheet of the company with certain adjustments."
For the sake of clarity, we observe that neither of the parties contend that this buy-sell agreement provides for the use of life insurance proceeds to purchase in full the deceased member's stock. Rather, the parties agree that the pertinent provisions of this contract are to the effect that payment of the life insurance proceeds in excess of the deceased member's share of the indebtedness is in addition to the book value of the stock. This interpretation comports with the trial Judge's final decree and stands unchallenged on appeal by either party.[1]
Applying this interpretation, the trial Judge, on the one hand, used December 10, the date of death, to determine the balance of the indebtedness and thereby computed the life insurance proceeds payable to Mr. Snook's estate after payment of his pro rata share of such indebtedness. On the other hand, he used November 30, "the last day of the month immediately preceding the date of death," to compute the estate's pro rata share of the book value of McCauley. *Page 1014 
It is the trial Judge's use of these two different dates (December 10 for fixing corporate indebtedness and November 30 for fixing the book value) that formulates the dispositive issue on this appeal.
Before we proceed with our discussion of the respective contentions bearing on this issue, we believe that our review of the record has disclosed an inadvertence in the trial Judge's computation of the award that is worthy of our clarification. The final decree rendered a judgment for $94,456, plus interest at 6% per annum from June 10, 1974. In briefs and during oral argument, counsel for both parties acknowledged their inability to substantiate from the record the $94,456 figure arrived at by the trial Judge in his final decree.
This was a long and complicated trial spanning many days and comprising a three-volume record with multiple exhibits (16 for each side). Inadvertently, and understandably, the trial Judge made reference to the wrong balance sheet after correctly designating the proper balance sheet in his initial findings. By using a balance sheet marked defendant's exhibit 15, he took the book value, $113,071; properly subtracted $18,615, the cash surrender value of Mr. Snook's policy;[2] and arrived at the balance due the Snook estate, $94,456. The trial Judge had rejected this balance sheet in his preliminary findings and unquestionably he intended to use the balance sheet marked plaintiff's exhibit 8, which shows a book value of $121,887.40, less the cash surrender value of the policy of $18,615. Thus, the trial Court obviously intended to award the Snook estate $103,272.40, plus interest at 6% per annum from June 10, 1974.[3]
 The Decision
The dispositive issue may be restated thusly: Did the trial Court err in interpreting the buy-sell agreement to provide that one date (December 10) was applicable for fixing the corporate debt, while finding that another date (November 30) was applicable for fixing the stock's book value? We hold that this interpretation was legally incorrect; therefore, we reverse and remand for recomputation of the award due the Snook estate by McCauley in accordance with the instructions contained in this opinion.
To put this issue in perspective, we review in summary the significance of the two dates in controversy. Because the buy-sell agreement provides for the payment of 1) all life insurance proceeds in excess of the deceased member's proportionate share of the corporate indebtedness and 2) book value of his stock, the Snook estate is entitled to $48,000 more if December 10 is used in fixing the corporate indebtedness rather than November 30 — the date used in fixing the book value. This is due to the fact that between the book value date (November 30) and the date of death (December 10) McCauley paid $240,000 on the corporate indebtedness, 1/5 (Mr. Snook's share) being $48,000. Or, stated conversely, if the same date of November 30 is used for fixing both the indebtedness and the stock's book value, the estate is entitled to $48,000 less total payment from McCauley — the excess of life insurance after payment of the estate's share of the bank debt of $540,000 rather than $300,000. Because the book value date of November 30 remains constant under either interpretation, the difference, then, is 1/5 of McCauley's $240,000 bank payment, or $48,000.
In our consideration of the issue here presented — construing a contract which by its terms is ambiguous and uncertain — we are guided by the following well-established legal principles: *Page 1015 
A court in construing contracts, which on their face are ambiguous, will look to the intention of the parties. City ofFairhope v. Town of Daphne, 282 Ala. 51, 208 So.2d 917 (1968).
The court derives the intention of the parties by looking at the whole of the provisions of the contract. Sisco v.Empiregas, Inc. of Belle Mina, 286 Ala. 72, 237 So.2d 463
(1970); City of Albany v. Spragins, 208 Ala. 122, 93 So. 803
(1922).
Along with the provisions of the contract, the conduct and relations of the parties and the subject matter may also be used in construing the contract to ascertain the intention of the parties. Merchants' Nat. Bank of Mobile v. Hubbard,220 Ala. 372, 125 So. 335 (1929).
Where a contract is subject to two constructions, unconscionable results are to be avoided. Lowery v. May,213 Ala. 66, 104 So. 5 (1925).
Courts cannot make contracts for parties, but must give such contracts as are made a reasonable construction and enforce them accordingly. R.P. Harris, Co. v. Thomas, 17 Ala. App. 634,88 So. 51 (1921).
We observe at the outset that these propositions, easily stated and readily understood in the abstract, are oft times difficult of application to the particular facts of any given case. But this difficulty of application does not relieve the court of its duty to resolve the controversy caused by conflicting interpretations arising from ambiguous and uncertain language; nor is the court relieved of its duty to enforce the terms of the contract according to its interpretation of the intent of the contracting parties.
Our analysis proceeds on the premise that the provisions of this contract are not only ambiguous as to the date to be applied in fixing the corporate indebtedness, but it is likewise ambiguous as to the date to be applied in fixing the book value of the deceased member's stock. The only reference in the contract to a date certain is found in paragraph 2 (b), which directs certain adjustments to the "most recent Balance Sheet" be made "on the last day of the month immediately preceding the date of death of the deceased Stockholder."
Applying the legal principles above set out, and with ample supportive evidence, the trial Court found that the November 30 balance sheet (plaintiff's exhibit 8) was "the most recent Balance Sheet", even though this document was neither prepared nor presented to the Snook estate until more than five months following Mr. Snook's death. While the accuracy of plaintiff's exhibit 8 was strongly contested by McCauley during trial and on appeal, both parties concede the applicability of November 30, 1973, as the date for fixing the corporate stock's book value.
Given the trial Court's construction of the contract as to the stock's book value date of November 30, the inquiry which necessarily follows is: Does the record reveal any competent evidence to support the trial Court's conclusion that the indebtedness date, according to the contract, should be December 10 (date of Mr. Snook's death)? Our careful review of the record fails to disclose any such supportive evidence.
Appellee does not suggest that the trial Court's conclusion in this regard is supported by objective testimony; rather, counsel for the Snook estate contends that it is logical, even necessary, to use the date of Mr. Snook's death to establish the balance of the corporate debt because only then were the insurance proceeds due and payable to extinguish the deceased member's proportionate share of the debt. But the source and availability of the funds for payment of McCauley's bank indebtedness, on the one hand, and the applicable date to establish the balance due the bank, on the other hand, are two different matters. Indeed, no payment was due the estate or the bank, either by way of life insurance proceeds or for book value of the estate's stock, until the date of Mr. Snook's death.
It is the uncertainty and inconsistency of result, influenced by uncontrolled or unilaterally controlled variables, that force us to the conclusion that it was not the date of death but November 30 that the parties *Page 1016 
necessarily intended as the date to establish both the bank balance of the corporate indebtedness and the book value of the stock. The following hypothesis will illustrate our reasoning: Suppose McCauley had drafted a corporate check payable to the bank for $240,000 on November 30 (Friday); the corporate balance as of November 30 properly reflected this reduction of assets; Mr. Snook died on Sunday, December 2; and the bank credited payment of the $240,000 on Monday, December 3. Surely, a court of conscience would vindicate the Snook estate's cry of "foul" if McCauley contended that the book value had been reduced by the $240,000 payment to the bank but that the corporate debt had not been reduced by that same amount.
While it is true, under these assumed facts, that the $240,000 payment was properly reflected on the November 30 balance sheet but not credited by the bank to McCauley's indebtedness at the time of Mr. Snook's death, the contracting parties could hardly have intended that McCauley take the dual benefits of the unreduced debt and the reduced book value of the stock. In construing ambiguous contracts, such unconscionable results are to be avoided. Lowery v. May, supra. The facts of the instant case invoke the same rule of construction.
Consider one other of multiple variables that could produce uncertain results: Suppose McCauley had been aware of Mr. Snook's imminent death on December 10 (which, incidentally, the record discloses to be the case) and had elected by design to withhold payment of the $240,000 to the bank until December 11. Under these facts, the November 30 balance sheet would remain unchanged but, the Snook estate's share of the indebtedness would still be $108,000, or $48,000 more than if the $240,000 payment had been paid one day earlier. Clearly, if we accept the construction that the parties intended to use the two different dates for fixing the two accounting incidents, we would have accorded to parties to the contract the intent to permit unilateral manipulation by one party to the detriment of the other.
To be sure, this very problem, though not by design, was presented (and left unresolved) in the instant case. Coincidentally, the corporate check to the bank was drawn on December 6 but not credited by the bank to the reduction of the debt until December 10. Did the moment of Mr. Snook's death on December 10 precede or follow the moment of the reduction of the debt? We think the mere suggestion of this inquiry precludes any validity to the contention that the parties intended to use different dates to establish the two separate accounting incidents.
We hold that not only is such an interpretation unsupported by competent evidence, but the rules of contract construction, when applied to the instant case, render such a result irrational and unreasonable. This random and capricious fixing of the date of the debt, which is inconsistent with the more definitive date for the fixing of the book value, could hardly have been within the contemplation of the contracting parties.
We now turn to the specifics of computing the estate's award using November 30, 1973, as the date for fixing the stock's book value and the balance of McCauley's bank indebtedness. As shown by the November 30 balance sheet, the estate's share was worth $121,887.40, less the cash surrender value of Mr. Snook's life insurance policy in the amount of $18,615, for a net product of $103,272.40. The life insurance proceeds in excess of the November 30 indebtedness balance was $142,986.54, which is computated by taking the total insurance proceeds of $250,986.54 received by McCauley and subtracting $108,000 — the estate's share of the $540,000 indebtedness of the corporation as of November 30. As provided by the agreement, the excess insurance proceeds of $142,986.54 are added to the book value of $103,272.40 to make the total payment due the Snook estate $246,258.94. The corporation has already remitted $190,986.54, leaving an amount due by McCauley to the *Page 1017 
Snook estate of $55,272.40, plus interest at 6% per annum from June 10, 1974.
We find no merit in the remaining contentions raised by the appellant.
REVERSED AND REMANDED WITH INSTRUCTIONS.
BLOODWORTH, SHORES and EMBRY, JJ., and SIMMONS, Retired Circuit Judge, sitting by designation of the Chief Justice, concur.
[1] We note parenthetically that we do not necessarily agree with this interpretation in view of the concluding phrase of paragraph 2 (a), ". . . in part payment of the purchase price of the stock of said deceased stockholder." Appellant agrees with appellee, for the purpose of this appeal, however, that the total purchase price to be paid the estate by the corporation is that portion of the life insurance proceeds which exceeds the estate's pro rata share of the corporate debt plus the book value of the estate's corporate stock; and, therefore, the term "in part payment" has no reference to the book value. At any rate, it is not incumbent upon this Court to decide an issue not presented on appeal.
[2] This $18,615 cash surrender value deduction was necessary and proper due to the fact that this figure was included in the November 30 balance sheet as an asset. It was correct to include the surviving members' share of the total cash surrender value in computing book value but not the deceased member's share because the full face value of the life insurance policy, in accordance with the terms of the contract, is payable to the estate.
[3] This date is fixed by another provision of the contract not set out in this opinion.