742 So.2d 159 (1999)
BEAVER CONSTRUCTION COMPANY, INC.
v.
LAKEHOUSE, L.L.C., et al.
1971829.
Supreme Court of Alabama.
August 6, 1999.
*161 John R. Bradwell of Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery; and Edward P. Meyerson of Berkowitz, Lefkovits, Isom & Kushner, Birmingham, for appellant.
Randy Myers of Richard Jordan, Randy Myers & Ben Locklar, P.C., Montgomery, for appellees.
COOK, Justice.
Beaver Construction Company, Inc. ("Beaver"), appeals from an order of the Montgomery Circuit Court denying its motion to dismiss or to stay, pending arbitration, an action commenced against it by Lakehouse, L.L.C. ("limited liability company"), and individual "members" thereof, namely, Forrest E. Waters III, Kenneth T. Harris, Forrest E. Waters II, Marlin F. Waters, and Lewis C. McKinney II, and Kenneth T. Harris. We reverse and remand.
In the spring of 1996, Beaver and Lakehouse entered into an arrangement, whereby Beaver agreed to build, and Lakehouse agreed to pay for, an apartment complex in Birmingham, to be known as "Lakehouse Apartments." The agreement of the parties was memorialized by a number of written instruments, including (1) a form styled "Construction Contract Cost Plus," United States Department of Housing and Urban Development Form 92442A ("the HUD Form"); (2) a document styled "General Conditions of the Contract for Construction," American Institute of Architects Document A201 ("the AIA Document"); and (3) the project "drawings and specifications." The HUD Form and the AIA Document were executed on March 7, 1996. We will refer to those two documents, along with the project "drawings and specifications," collectively as "the Construction Contract."
The HUD Form was a four-page instrument that read in pertinent part:
"Article I Scope of Contract
"A. The Contract between the parties is set forth in the `Contract Documents,' which consist of this Agreement, the Drawings and Specifications, which include the current edition of AIA Document A201, `General Conditions of the Contract for Construction,' and Form HUD 2445, `Supplementary Conditions of the Contract for Construction.'"
It was signed for Lakehouse by Forrest E. Waters III.
The AIA Document contained the following pertinent provisions:
"4.3.2 Decision of Architect. Claims, including those alleging an error or omission by the Architect, shall be referred initially to the Architect for action as provided in Paragraph 4.4. A decision by the Architect, as provided in Subparagraph 4.4.4, shall be required as a condition precedent to arbitration or litigation or a Claim between the Contractor and Owner...."
"4.5.1 Controversies and Claims Subject to Arbitration. Any controversy or Claim arising out of or related to the Contract, or the breach thereof shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof...."
"13.1.1. The Contract shall be governed by the law of the place where the Project is located."
"13.4.1. Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of *162 duties, obligations, rights and remedies otherwise imposed or available by law."
(Emphasis added.)
In addition to the documents executed on March 7, the arrangement included an "Agreement," which was executed on February 27, 1996 (the "February Instrument"). In the February Instrument, Beaver was defined as the "Contractor." Five individual "members" of Lakehouse, namely, Forrest E. Waters III, Forrest E. Waters II, Marlin F. Waters, Lewis C. McKinney II, and Kenneth T. Harris, were named by the February Instrument as "Sponsors." It contained the following pertinent provisions:
"WHEREAS, CONTRACTOR has executed a Construction Contract Cost Plus [HUD Form 92442A], dated February 27, 1996, (hereinafter referred to as `CONTRACT')[1] with Lakehouse, LLC, an Alabama limited liability company (hereinafter referred to as "LLC") with an upset amount of Five Million, Six-Hundred Nineteen Thousand, and Thirteen Dollars ($5,619,013.00).
"WHEREAS, SPONSORS have agreed to pay certain payments to CONTRACTOR in addition to the amount which will be due CONTRACTOR under the said CONTRACT;
"WHEREAS, the intent of this Agreement is that CONTRACTOR will be paid the `actual cost of construction' of the project as defined in the CONTRACT plus the amount of $168,571, all of which shall not exceed $5,787, 584.00.
"NOW, THEREFORE, in consideration of One Dollar ($1.00) and other valuable consideration the receipt of and sufficiency of which is hereby acknowledged, the undersigned parties agree as follows:
"1. This Agreement does not modify any of the terms and conditions of said CONTRACT except to the extent it modifies the time of payment and requires SPONSORS to pay certain additional payments to CONTRACTOR.
". . . .
"3. [LAKEHOUSE] LLC and/or SPONSORS (as is appropriate) shall pay CONTRACTOR an amount which is computed as follows:
"(a) the `actual cost of construction' as defined in the CONTRACT and approved by for [sic] payment pursuant to the cost certification procedures of HUD,
"(b) plus the amount of $168,571.00, all of which shall not in any event, except for approved change orders, exceed $5,787,584.00
"4. The SPONSORS will pay the amount by which the CONTRACT is increased by this Agreement which is $168,571, plus approved Change Orders, in monthly increments pro rata to the percentage of project completion. Said amount shall be paid at the time the insured draws are paid. Final payment shall be due at the time of Final Endorsement by HUD of the mortgage note pertaining to the subject project.
"5. CONTRACTOR agrees to deliver the units in stages and as units are ready, to have HUD, the City and other necessary parties conduct occupancy inspections, and to permit the managing agent to begin leasing the units and achieve occupancy at the earliest possible date.
"6.(a) The undersigned CONTRACTOR agrees that it will be paid the sum of $168,571 by SPONSORS, plus all Change Orders approved in writing by Forrest E. Waters III or Marlin Waters. The undersigned CONTRACTOR does not now and will not later assert, any claim against the mortgaged property, the mortgage proceeds, any reserve or deposit made with the mortgagee or another required by the Assistant Secretary-FHA Commissioner in connection with the mortgage transaction, or *163 against the rents or other income from the mortgaged property for payment of any part of such amount of $168,571.
"6.(b) If SPONSORS fail to pay any installment of the $168,571 when due, interest shall accrue on the total amount unpaid at the rate of 10% per annum and if CONTRACTOR employs the services of an attorney for collection, by suit or otherwise, SPONSORS shall pay all costs of collection and litigation, together with reasonable attorney's fees incurred by CONTRACTOR in connection therewith."
(Emphasis in original.) (Footnote added.) The February Instrument was signed by a vice president of Beaver and by the five individual "Sponsors."
On November 10, 1997, Lakehouse and the Sponsors sued Beaver, alleging (1) that Beaver had failed to prepare the construction site in conformity with the Construction Contract, (2) that it had "failed to install the sanitary sewer and related items prior to commencing work," and (3) that it was wrongfully withholding 121 "sewer tap permits" that the Jefferson County Sewer and Sanitation Department had issued for the construction of the project.[2] The complaint contained a claim alleging breach of the "Construction Contract" generally and a separate claim alleging breach of the February Instrument. It also contained claims alleging negligence, wantonness, and willfulness; misrepresentation, suppression, and fraudulent inducement; and conversion of the sewer tap permits (collectively "the tort claims").
On November 12, 1997, Beaver filed a demand for arbitration of the dispute with the American Arbitration Association, alleging that Lakehouse and the members had breached and improperly terminated the contract. On December 27, 1997, Beaver filed a "Motion to Dismiss or, in the Alternative, Application for a Stay," on the ground that the action had been commenced "in violation of a valid arbitration agreement." On June 8, 1998, the trial court denied Beaver's motion, stating that "the Plaintiffs did not intend to submit their claims against [Beaver] to arbitration." Beaver promptly appealed the denial of that motion. On appeal, Lakehouse and the Sponsors contend (1) that the parties did not intend for arbitration to be the exclusive means of redress; (2) that the tort claims are not arbitrable; (3) that the members are not required to arbitrate their individual claims against Beaver; and (4) that the claim alleging breach of the February Instrument is not arbitrable.

I. Exclusive Means of Redress
The first argument of Lakehouse and the Sponsors is based on the AIA Document, ¶¶ 4.3.2, 13.1.1, and 13.4.1. These three provisions, they contend, indicate that arbitration was not to be the exclusive means of redress. We disagree with that contention.
First, ¶ 13.1.1. merely provides that "[t]he Contract shall be governed by the law of the place where the Project is located." However, the law in Alabama is that agreements to arbitrate are enforceable if they are part of a valid contract involving interstate commerce. Georgia Power Co. v. Partin, 727 So.2d 2, 5 (Ala. 1998) (applying the Federal Arbitration Act, 9 U.S.C. § 1 et seq.). Cf. Fidelity Nat'l Title Ins. Co. of Tennessee v. Jericho Management, Inc., 722 So.2d 740, 743 (Ala. 1998) (the phrase "applicable law" in a provision requiring arbitration "unless arbitration would be `prohibited by applicable law'" included both state and federal law and did not preclude enforcement of the arbitration provision) (opinion of three Justices, with two Justices concurring in the result).[3]
*164 Second, ¶ 13.4.1 states: "Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law." (Emphasis added.) The plaintiffs contend that "[t]his provision allows the parties to choose rights and remedies they desire to choose such as the right to a jury trial through litigation." Brief of Appellees, at 15. In other words, they argue that the Construction Contract expressly allows the parties to choose the forum in which to seek redress, or, as they state it, that "the contract indicates that either arbitration or litigation is appropriate." Id. (emphasis added).
We do not understand how the contract could be implemented by the parties under this interpretation of ¶ 13.4.1. By definition, binding arbitration iscontrary to the terms of ¶ 13.4.1 as the plaintiffs interpret ita limitation on the right to litigate. In other words, one party cannot litigate while the other party arbitrates. Thus, the plaintiffs essentially argue that the parties included ¶¶ 4.5.1 to .7, which set forth in detail specific procedures to be followed in arbitration, only to negate in ¶ 13.4.1 those very provisions. We cannot construe the Construction Contract in such a manner.
"A court in construing contracts, which on their face are ambiguous, will look to the intention of the parties." Charles H. McCauley Assocs., Inc. v. Snook, 339 So.2d 1011, 1015 (Ala.1976). "Courts cannot make contracts for parties, but must give such contracts as are made a reasonable construction and enforce them accordingly." Id. This is so, because "`it is presumed that parties intend to make reasonable contracts.'" Ex parte Bonds, 581 So.2d 484, 487 (Ala.1991) (quoting Weathers v. Weathers, 508 So.2d 272, 274 (Ala.Civ.App.1987)).
To be sure, the parties mightin any disputeagree to litigate, and, in so doing, waive the right to compel arbitration. However, the same result would obtain in the absence of a contract, or if the contract was silent on the question of arbitration. Because the Construction Contract is not silent, the parties must have intended to limit the forum for redress.
In this connection, Beaver contends:
"[Paragraph 13.4.1] does not address arbitration and in no way waives or alters Plaintiff's duty to arbitrate claims arising from or relating to the Contract. That [paragraph] merely preserves claims and remedies available at law, in addition to those in the contract. Plaintiffs may maintain those claims, rights, and remedies in arbitration. The fact that the claims will be resolved in arbitration will not change the duties and obligations under the contract nor will it change the rights and remedies available to the parties in arbitration. The only distinction will be the forum in which those rights and remedies are resolved."
Reply Brief of Appellant, at 8 (emphasis added). We agree with Beaver's contentions. See Goodwin v. Ford Motor Credit Co., 970 F.Supp. 1007, 1014 (M.D.Ala.1997) ("[A]rbitration is not a remedy, but a choice-of-forum in which to seek remedies (just as a jury trial is no more or less a remedy than a bench trial)....").
Also under this heading, the plaintiffs argue that ¶ 4.3.2 contains the phrase "arbitration or litigation" (emphasis added), in order, they assert, to give the parties a choice. However, implementation of the Construction Contract under this interpretation would be unworkable, for the reasons *165 just expressed. Because, as a practical matter, arbitration and litigation of the same subject matter are mutually exclusive, the plaintiffs' interpretation of the Construction Contract is unworkable. We next address the contention that the tort claims are not arbitrable.

II. Tort Claims
The trial court held that the plaintiffs' tort claims were "independent of and outside the scope of the arbitration clause in the construction contract and [were] therefore not subject to arbitration." Beaver relies particularly on this phrase in ¶ 4.5.1: "Any controversy or Claim arising out of or related to the Contract." (Emphasis added.) It correctly states that "relatingto" language has been held to constitute a relatively broad arbitration provision. See Reynolds & Reynolds Co. v. King Automobiles, Inc., 689 So.2d 1, 2-3 (Ala.1996); Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala.1994).
"[I]t is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract." McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir.1984); see Gregory v. Electro-Mechanical Corp., 83 F.3d 382 (11th Cir.1996); Ex parte Dyess, 709 So.2d 447, 454 (Ala.1997) (claims of fraud, bad faith, and the tort of outrage were arbitrable); Coastal Ford, Inc. v. Kidder, 694 So.2d 1285, 1288 (Ala. 1997) (fraud claim was arbitrable). Beaver asserts: "Every count in the Plaintiffs' complaint targets the fact that Beaver Construction allegedly did not construct the project pursuant to the requirements of the Construction Contract." Brief of Appellant, at 15. Thus, it contends, the tort claims are intimately "related to" the subject matter of the Construction Contract as that term is used in ¶ 4.5.1. We agree with this contention.
Count III of the complaint alleges that Beaver negligently breached its duty to "construct the Lakehouse Apartments in a workmanlike and nonnegligent fashion, and in accordance with the Plans and Specifications." Count IV alleges that Beaver "performed the construction work at Lakehouse Apartments in a willful and wanton fashion as described hereinabove." Count VI alleges that "[b]y executing the Construction Contract" (emphasis added), Beaver made a number of misrepresentations regarding the degree of its knowledge of the "local conditions" and its attention to the "Contract documents." Count VII alleges that Beaver fraudulently induced Lakehouse "to enter into the Construction Contract and ... into the [February Instrument]." Count VIII alleges that Beaver suppressed the existence of an "identity of interest" between it and certain subcontractors and other parties to the arrangement. Count XIV alleges that "Beaver has failed or refused to return the Sewer Tap Permits to [the] Plaintiffs ... or to transfer the Permits to a replacement contractor as instruct[ed] by [the] Plaintiffs." These claims fall squarely within the scope of the arbitration clause, and are, therefore, arbitrable.
The Sponsors also argue that their individual tort claims are nonarbitrable. This is so, they insist, because they were not signatories to the Construction Contract and, therefore, cannot be compelled to arbitrate their tort claims. These arguments fail for at least two reasons.
First, we have already determined that the tort claims are within the scope of the arbitration clause. Second, by arguing that they were not signatories to the Construction Contract between Beaver and Lakehouse, their corporation, they have conceded that they have no viable individual claims based on the transactions between Beaver and Lakehouse.[4] This argument *166 is substantially the same as the one we rejected in Ex parte Warren, 718 So.2d 45 (Ala.1998), where we stated:
"Although the Warrens brought their claims as co-parties to the contract, Mrs. Warren concedes in her brief that she is `not a party to the contract containing the arbitration agreement,' Warren reply brief at 4, and that she is not a third-party beneficiary of that contract. Warren reply brief at 7. The record confirms that the contract does not name Mrs. Warren as a party and that it does not refer to her. In her efforts to avoid arbitration, Mrs. Warren has conceded that she has no right to recover under the contract, by disavowing any status as a party to the contract or as a third-party beneficiary. Also, because she has disavowed any status as a party to the contact, she has no claim based on fraud in the inducement of that contract. Because Mrs. Warren has disclaimed any basis for recovery on her claims, any error in compelling arbitration of her claims would be harmless."
718 So.2d at 47-48. (Footnote omitted.) (Emphasis added.) In other words, "by disavowing any status as [parties] to the contract," the Sponsors have also "disclaimed any basis for recovery" on the tort claims that relate to the execution of the Construction Contract.

III. Breach of the February Instrument
The Sponsors are, however, individual signatories to the February Instrument. They contend that their individual claims against Beaver contained in Count II, which alleges breach of the February Instrument, are not arbitrable. This is so, they argue, because the February Instrument did not contain an arbitration clause. Essentially, they argue that the February Instrument is not a part of the Construction Contract at all, but is, in fact, an independent agreement.[5] We disagree with this argument.
To be sure, the February Instrument does not, on its face, contain an arbitration clause. However, it repeatedly references the HUD Form, which, in turn, references the AIA Document, which does provide for arbitration. A familiar rule of contract law holds that "[w]here a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties." 17A Am.Jur.2d Contracts § 400 (1991). See also Ben Cheeseman Realty Co. v. Thompson, 216 Ala. 9, 12, 112 So. 151, 153 (1927). For the application of this rule in the arbitration context, see McDougle v. Silvernell, 738 So.2d 806 (Ala.1999); Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala.1998); and Reynolds & Reynolds Co. v. King Automobiles, Inc., 689 So.2d 1, 3 (Ala. 1996).
Beaver contends: "The [February Instrument] cannot stand on its own as an enforceable contract. It is subject to the terms, conditions, and requirements of the Construction Contract. The Construction Contract and the [February Instrument] arise from a single project and reference to the Construction Contract is central to an understanding of the [February Instrument]." Brief of Appellant, at 18. We agree with this contention. The purpose of the February Instrument was to require Beaver to expedite the occupancy of apartment units as they were completed, by, among other things, procuring the necessary *167 "occupancy inspections." In return, the Sponsors were required to pay an amount in excess of the amount stated in the Construction Contract, "in monthly increments pro rata to the percentage of project completion." Indeed, the February Instrument is intelligible only in reference to the HUD Form and the other instruments that form the Construction Contract. Thus, it is clear the February Instrument is not a separate, independent agreement, but, instead, an integral part of the Construction Contract.
Moreover, ¶ 1 of the February Instrument states: "This Agreement does not modify any of the terms and conditions of said CONTRACT except to the extent it modifies the time of payment and requires SPONSORS to pay certain additional payments to CONTRACTOR." (Emphasis added.) Among those "terms and conditions" were, of course, the arbitration provisions in the AIA Document.

Conclusion
The claims of Lakehouse and the Sponsors fall within the scope of the arbitration clause and are subject to arbitration. The trial court erred in denying Beaver's motion to stay the action pending arbitration. The order of the trial court is, therefore, reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, LYONS, and BROWN, JJ., concur.
COOK and JOHNSTONE, JJ., concur specially.
COOK, Justice (concurring specially).
When Fidelity National Title Insurance Co. of Tennessee v. Jericho Management, Inc., 722 So.2d 740 (Ala.1998) (three Justices concurring and two Justices concurring in the result)cited in the main opinion was decided, the main opinion was accompanied by a dissent, in which I joined. The dissent proposed that the phrase "unless [arbitration would be] `prohibited by applicable law,'" was referable only to state law. Id. at 745-47 (Almon, J., dissenting). I continue to adhere to that view, because the Federal Arbitration Act, 9 U.S.C. § 1 et seq., would never prohibit arbitration. When it applies, that is, when the transaction involves interstate commerce, the FAA has the effect of requiring the specific enforcement of arbitration provisions. Thus, the only law to which that phrase could have referred is state law, which, in the absence of preemption, would prohibit the enforcement of an arbitration clause in Alabama. However, the dissent's proposition was rejected by this Court, and, consequently, is not the law of Alabama. Moreover, Jericho is distinguishable, because ¶ 13.1.1. of the AIA Document, providing that "[t]he Contract shall be governed by the law of the place where the Project is located," is a standard choice-of-law provision and, therefore, is materially different from the provision construed in Jericho.
JOHNSTONE, J., concurs.
JOHNSTONE, Justice (concurring specially).
I concur with the majority opinion and also join the special writing by Justice Cook.
NOTES
[1] The HUD Form was actually executed on March 7, 1996.
[2] The plaintiffs alleged that they had procured another contractor and that that other contractor needed the sewer taps to complete the work.
[3] Validity is determined according to "ordinary contract principles." Georgia Power Co. v. Partin, 727 So.2d at 5. Thus, "an arbitration agreement, like any other contract, is subject to generally applicable contract defenses, such as fraud, duress, or unconscionability." Allstar Homes, Inc. v. Waters, 711 So.2d 924, 929 (Ala.1997). Significantly, none of those defenses is presented in this case. It does not involve a consumer contract typically adhesiveover which one party had no bargaining power. On the contrary, this Contract was negotiated on a "level playing field" by sophisticated, affluent parties.
[4] For purposes of this argument, it does not matter whether Lakehouse is technically a corporation. This is so because Lakehouse and the Sponsors have treated it as such in their brief. For example, they argue:

"A corporation is an entity distinct and separate from the person or persons who are its shareholders. Under Alabama law the transactions of the corporation are to [be] considered separate from those of its shareholders. If, in fact, the Court finds that Lakehouse signed a contract containing a binding arbitration clause, that, in and of itself, would not bind its individual members who did not sign a contract containing an arbitration provision."
Brief of Appellees, at 20 (emphasis added).
[5] In this connection, Lakehouse and the Sponsors characterize the February Instrument as a "Side Agreement."