941 So.2d 1263 (2006)
TWIN OAKS AT SOUTHWOOD, LLC, Appellant,
v.
SUMMIT CONSTRUCTORS, INC., a Florida Corporation, Appellee.
No. 1D06-3913.
District Court of Appeal of Florida, First District.
November 22, 2006.
*1264 M. Stephen Turner, P.A., and J. Nels Bjorkquist, of Broad and Cassel, Tallahassee, for Appellant.
Hugh M. Davenport, Jacksonville, for Appellee.
BARFIELD, J.
The defendant in a lawsuit arising out of a construction contract appeals a non-final order which granted the plaintiff's motion to dismiss the defendant's counterclaims and determined that the plaintiff was entitled to arbitration of the counterclaims. We find that the trial court erred in finding that the plaintiff did not waive its right to demand arbitration when it instituted the litigation.
In 2002, appellant/owner and appellee/contractor entered into a "cost plus" contract for construction of a housing complex under the supervision of the federal Department of Housing and Urban Development (HUD), to be completed in February 2004 (hereinafter designated "the Contract"). The Contract provided that the agreement between the parties was set forth in the "Contract Documents," which included, inter alia, the AIA "General Conditions of the Contract for Construction." The AIA general conditions defined "Contract Documents" as including, inter alia, "Modifications issued after execution of the Contract," and defined "modification" in this context as "(1) a written amendment of the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect." The AIA general conditions also included an arbitration clause: "Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration."
In May 2004, three months after the completion date contemplated in the Contract, the parties entered into a "Project Completion Agreement" (PCA), which referenced the Contract. The PCA stated that the parties had agreed to two change orders which had been "fully funded," and that a third change order had been approved for an extension of the contract completion date. It noted that problems attributable to the architect had caused substantial delays in the progress of the work, that additional upgrades had been made and additional fee obligations had been incurred, and that the parties wished "to conclude construction expeditiously and [to] resolve all issues known or which could have been known and to establish with finality amounts that will be due [the contractor] upon final completion of the project." The owner agreed that $340,012.00 would be due the contractor "in addition to *1265 Contract initial amount and the previously funded Change Orders No. 1 and No. 2 to cover all issues known or which could have been known through project completion." The owner also agreed to pay the water connection fees, to waive any liquidated damages under the contract "up to September 1, 2004," and to request that the 10% retainage be reduced to 5% when the project was certified 90% complete by HUD. Paragraph six provided: "This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and may not be amended except in a writing signed by the Parties." Paragraph eight provided: "Except as provided herein, the terms and conditions of the Contract shall remain in full force and effect."
In May 2005, one year after the PCA was signed, nearly nine months after the completion date referenced in the PCA, and four months after the substantial completion date in January 2005, the parties entered into a "Project Disbursement Agreement" (PDA), which referenced the Contract and incorporated the PCA. It stated that the "total unpaid balance in the HUD Contract for Construction plus approved change orders" was just under $2.5 million and that the parties and the lender "wish to facilitate the final endorsement of the Project by providing for an agreed upon assessment of liquidated damages" to allow the owner, lender, and HUD "to balance the loan and disburse the balance of the funds designed for construction to [the contractor]." The contractor agreed to provide the documents required to remove all liens filed by it or its subcontractors and to keep the property free of any future liens. In return, the lender agreed to disburse to the contractor $1.5 million, which represented the amount due at that point, less $471,413.00 in liquidated damages (the actual liquidated damages would have exceeded $800,000). The parties agreed that at final endorsement, the lender would disburse to the contractor the remainder of the unpaid balance. Paragraph eight provided: "Except as provided herein, the terms and conditions of the Contract shall remain in full force and effect." Paragraph nine provided: "This written Agreement and all of its provisions shall be considered to be the complete Agreement between the Parties relating to the matters set forth herein, notwithstanding any oral representations or other writings to the contrary and may not be amended except in a writing signed by all Parties to this Agreement."
In December 2005, the contractor filed a complaint against the owner which referenced the Contract, the PCA, and the PDA, and which sought payment of $340,012.00 "as required by the Project Completion Agreement," together with prejudgment interest and costs. The owner's answer asserted that the PCA became part of the subsequent PDA, "which finally resolved the amounts to be paid to Plaintiff after construction was fully completed," that the PDA "is an accord and satisfaction of any amount owed for project construction," and that the actual liquidated damages chargeable to the contractor for failure to complete the work by the extended completion date "far exceeded the amount due under the Project Completion Agreement, and were foregone under the Project Disbursement Agreement to satisfy all obligations." As affirmative defenses, the owner asserted that the PDA fulfilled all of the owner's obligations to pay the contractor "by accord and satisfaction," and that the owner was entitled to set-offs for utility charges it had paid on behalf of the contractor and for loss of utility refunds for which the contractor was responsible.
The owner was allowed to file a four-count counterclaim which referenced the three agreements between the parties. *1266 The first count stated that between the extended completion date and the substantial completion date, potential liquidated damages had accrued in the amount of $814,574.88, but that only $417,413.00 in liquidated damages were assessed under the PDA, leaving remaining liquidated damages of $397,161.88, which exceeded the amount the contractor was seeking to recover from the owner. The second count stated that defective work by the contractor had required the owner to incur $8,000 in repair costs and roughly $50,000 in estimated repair costs. The third count stated that the contractor had not installed backflow preventers as required by the building codes, that the cost of installing the backflow preventers was $100,000.00, and that the contractor had not agreed to pay for it after demand had been made. The fourth count stated that the contractor had reported to the owner that it was in full compliance with all procedural eligibility requirements for the City of Tallahassee's utility refund program, but that the contractor had not complied with the notice and bidding requirements, which had impaired the project's eligibility for utility refunds in the amount of $392,000.00.
The contractor filed a motion to dismiss the counterclaims, asserting that the counterclaims arose under the Contract, which required arbitration, but that the complaint arose out of the PCA and "will not require reference to or construction of any portion of the original construction contract." The owner's memorandum in opposition to the motion asserted that all the claims of the complaint and the counterclaims "are potentially arbitrable under the broad, expansive, and inclusive arbitration provision in the contract," but that both parties had waived their rights to demand arbitration of all "claims arising out of or related to" the construction contract. It argued that the contractor had waived its right to demand arbitration"by filing its complaint for payment of sums due for performance of work arising out of or related to the contract, and [by] taking other actions inconsistent with the right to arbitrate," including "by actively participating in discovery directly addressing the claims contained in the counterclaim." It argued that the owner had waived its right to demand arbitration by filing the affirmative defenses and counterclaim. It asserted that all the claims in the instant case "rely entirely on the mutual obligations under the construction contract and related agreements that incorporate the contract," but that the contractor improperly "wants to split this case by continuing to litigate its complaint while requiring [the owner] to arbitrate its counterclaim." It argued:
The interests of justice and judicial economy mandate either that both the complaint and counterclaim be arbitrated, or that both be tried before this Court. Splitting the litigation forums invites inefficiency, delay, and duplicate effort, particularly when the claim involves the same witnesses, contract documents, factual situation and timeline, and involve compulsory setoffs.
Both parties relied upon Seifert v. U.S. Home Corp., 750 So.2d 633 (Fla. 1999), in which the court addressed whether a tort claim for wrongful death was sufficiently related to a construction contract to mandate application of the arbitration provision of the contract to the tort claim. The owner also relied on Raymond James Financial Services, Inc. v. Saldukas, 896 So.2d 707 (Fla. 2005), and Owens & Minor Medical, Inc. v. Innovation Marketing and Distribution Services, Inc., 711 So.2d 176 (Fla. 4th DCA 1998), as well as Cabintree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc., 50 F.3d 388 (7th Cir. 1995), and E.C. Ernst, Inc. v. City of Tallahassee, 527 F.Supp. 1141 (N.D. Fla. 1981).
*1267 In the order granting the contractor's motion to dismiss the owner's counterclaim, the trial judge found that the PCA was "a separate agreement, which does not contain an arbitration provision, from the original contract, which does contain an arbitration provision," and that the contractor's "suing in the circuit court for breach of the Project Completion Agreement does not act as a waiver of the arbitration provision contained in the original contract," noting that "[i]f the intent of the parties was to arbitrate claims arising out of or related to a breach of the Project Completion Agreement then they should have included an arbitration provision in the agreement." The order cited Seifert, Saldukas, and Klosters Rederi A/S v. Arison Shipping Co., 280 So. 2d 678 (Fla. 1973).
The owner filed a motion for reconsideration or rehearing, in which it argued that paragraph eight of the PCA "specifically incorporates the terms and conditions of the contract," and that this had not been pointed out at the hearing. It cited OBS Co., Inc. v. Pace Constr. Co., 558 So.2d 404 (Fla. 1990), for the proposition that "[a] modification or amendment to a contract is part of the contract, and the two documents must be construed together by Florida courts as one whole agreement." It asserted that the PCA modified the original contract to the extent stated, and that the PCA "is meaningless and unintelligible outside the context of the parties' contract" and could not stand on its own as an enforceable contract. It argued that the PCA was "related" to the original contract and was therefore subject to the arbitration clause. It cited Beaver Constr. Co., Inc. v. Lakehouses, L.L.C., 742 So.2d 159 (Ala. 1999), which had not been cited at the hearing, as factually "very similar." It asserted that the trial judge had overlooked "Florida's strong public policy preference for arbitration requiring courts to resolve any doubts in favor of arbitration," citing Nicor International Corp. v. El Paso Corp., 318 F.Supp.2d 1160 (S.D. Fla. 2004). It argued that since the contractor had "elected to not seek arbitration by filing suit," the contractor "cannot compel arbitration of Defendant's counterclaims," and that a footnote in the trial court's order seemed to indicate that "all these contract matters are best resolved in the same forum."
The contractor's memorandum in opposition to the motion for reconsideration or rehearing argued that Beaver and OBS were both distinguishable, that the PCA was not a modification of the Contract, and that the mere reference in the PCA to the Contract was not sufficient to incorporate its terms, asserting that "[t]here must be an express intent to incorporate," citing Rosenblum v. Travelbybus.com Ltd., 299 F.3d 657 (7th Cir. 2002), and Kantner v. Boutin, 624 So.2d 779 (Fla. 4th DCA 1993). It argued that paragraph six of the PCA "certainly evinces an intent not to incorporate the arbitration provision into the Project Completion Agreement."
The owner's response asserted that the court had the authority to reconsider non-final orders at any time prior to the entry of a final order, and that the contractor "has not disputed this discretion." It argued that modifications were explicitly included in the Contract by provision of the AIA general conditions, that the PCA met the AIA definition of a modification and was part of the Contract, and that the PCA was therefore subject to the broad arbitration clause of the Contract. It asserted that the main issue was not whether the PCA had incorporated the Contract, but whether it had modified the Contract, citing OBS and C&M Ventures v. Wolf, 587 So.2d 512 (Fla. 3d DCA 1991). It argued that the contractor's efforts to distinguish Beaver based on chronology "fail to impeach its legal import" and that "[i]f *1268 anything, the chronology of the instant case weighs more heavily in favor of arbitration of Plaintiff's claim than do the facts in Beaver." It asserted that paragraph eight of the PCA showed the intent of the parties to modify some of the terms of the Contract, and "provides the best evidence of the parties' intent for the continued application of the dispute resolution process agreed to in the Contract." It argued that "[e]quity and judicial economy, not to mention the language of the contract, demand that these claims  both Plaintiff's and Defendant's  be resolved in the same forum, whether in arbitration or in circuit court, as Plaintiff elected."
The trial court denied the motion for reconsideration without discussion. The owner filed a notice of appeal, asserting that an order granting a motion to dismiss a counterclaim based on a contractual right to arbitration "is, in substance, an order compelling arbitration," citing U.S. Fire Ins. Co. v. Franko, 443 So.2d 170 (Fla. 1st DCA 1983), and Miller & Solomon Gen. Contractors, Inc. v. Brennan's Glass Co., Inc., 824 So.2d 288 (Fla. 4th DCA 2002).
We find that the trial court erred as a matter of law in ruling that the Project Completion Agreement was a separate agreement from the original construction contract and that the contractor's circuit court suit for breach of the Project Completion Agreement did not act as a waiver of the arbitration provision in the original construction contract. The challenged order is REVERSED, and the case is REMANDED to the trial court for further proceedings consistent with this opinion.
PADOVANO and POLSTON, JJ., concur.